David N. SEDERQUIST and Marilyn T. Sederquist, Plaintiffs-Appellants,

v.

CITY OF TIBURON, a municipal corporation, Defendant-Appellee.

No. 83–2111.

United States Court of Appeals, Ninth Circuit.

Argued Jan. 10, 1984.

Submitted March 1, 1984.

Decided Oct. 31, 1984.

As Amended July 15, 1985.

Robert G. Schuchardt, San Francisco, Cal., for plaintiffs-appellants.

Lisa A. Goldfien, San Rafael, Cal., for defendant-appellee.

Before MERRILL, SKOPIL, and FERGUSON, Circuit Judges.

SKOPIL, Circuit Judge:

This case presents another chapter in a long and bitter dispute between the City of Tiburon and several landowners. The essence of the landowners' claim is that the City has taken their property without just compensation in violation of the fifth and fourteenth amendments of the United States Constitution. The district court granted summary judgment in favor of the City. We reverse and remand.

## BACKGROUND

In 1959, David and Marilyn Sederquist acquired by deed approximately one acre at the top of Tiburon Ridge. Frank and Marie Gariffo acquired approximately one-half acre by deed in 1965, and J.W. Schuchardt similarly acquired approximately one-half acre in 1974. These lots and three others comprise an area referred to as the Hacienda Heights Subdivision located in the City of Tiburon. Tiburon was incorporated in 1964.

Each of these conveyances included a grant of a 50-foot easement to use Hacienda Drive for roadway and utility purposes. This easement extends from Hacienda Heights to Trestle Glen Boulevard, a public road. Hacienda Drive at this point is an unpaved road that bisects a "natural preserve" located near Hacienda Heights.

Hacienda Heights was created by the subdivision of a tract of property into five lots in 1958 and a sixth lot in 1959. According to the then California Subdivision Map Act, Cal.Govt.Code § 11535, the split of more than five parcels constituted a "subdivision." Although that Act required that a subdivision map be filed for each subdivision, no subdivision map for Hacienda Heights was filed. In 1974, the City discovered this deficiency and recorded notices of violation against the properties.

In 1967, the City adopted Ordinance 9NS. This ordinance zoned the landowners' property RO-1, which allowed for one residence per 40,000 sq. ft. (approximately one acre). In 1968, the Sederquists applied for a variance to allow their land to be divided into two lots. The City's Board of Adjustments investigated the request and recommended the variance be granted because "the proposed lots are in character with the other five lots in the immediate area." The City approved this variance by Resolution. For some unknown reason, a Parcel Map required to put this variance into effect was never filed.

In 1971, the Sederquists inquired about obtaining a building permit for one of their two lots. At this time the Sederquists

claim they discovered that a Parcel Map concerning the 1968 variance had never been recorded. The lack of a recorded Parcel Map nullified the 1967 lot split.

In February 1972, the Sederquists filed another application for a lot split. In April 1972, the Sederquists filed an application for a use permit. At that time the City had a moratorium on development of "ridge lands" that it was considering acquiring for "open space." This moratorium included the Sederquists' land. That moratorium necessitated the "use permit."

In August 1972, the City passed Resolution 466 which approved the use permit and authorized the renewed request for a lot split. The resolution conditioned approval, and hence recording of the Parcel Map, on the City Engineer's certification that "provision has been made for adequate road access, fire protection, and storm drainage." The City proceeded to certify the Sederquists' Parcel Map. This included a certification from the City Engineer that the map conformed with the requirements of section 11575 of the Subdivision Map Act. The Deputy City Engineer sent the Parcel Map and the Sederquists' check for the recording fee to the Director of Community Development. The Deputy City Engineer's accompanying letter stated the approval was of the map and not the conditions required by Resolution 466, as he understood they would condition approval of a building permit. The Director of Community Development certified the Parcel Map's compliance with Chapter 14 of the City Code. He then sent the map to the Marin County Recorder, who recorded it.

The City refuses to recognize the recording of the Parcel Map. It bases this on a claim that the Sederquists knew the conditions of Resolution 466 had not been met. It claims the approval of the lot split was done mistakenly.

In addition to the easement to use Hacienda Drive, the Sederquists own an easement to use Round Hill Road. The Sederquists claim this is an "imperfect easement" in that it is clouded by the existence of a one-foot non-access strip that the City must waive to permit the Sederquists to use the easement. This easement apparently also does not meet the City's standards in width for paving for residential access.

In November 1973, the Sederquists and others petitioned for approval of an Assessment District. The proposed district would have had the power of eminent domain to allow Round Hill Road to be widened so utilities could be constructed and the road paved as access to Hacienda Heights. A memorandum from the City Manager to the City Council recommended the Assessment District not be approved until the City: (1) adopts its "Circulation Element," and (2) "approves a Master Plan and an EIR" (Environmental Impact Report). The Town Council denied approval of the district without prejudice to the filing of a new petition.

The Sederquists inquired whether the City would allow them to pave and use Hacienda Drive. The City responded that, because it considered Hacienda Heights to be an illegal subdivision, the Sederquists needed to comply with all the requirements for a legal subdivision. It stated that one of those requirements was "the preparation of subdivision maps (which may be the 'master plan' of the area if you prefer)."

In November 1975, the Sederquists and Gariffos submitted an application to pave the relevant half-mile portion of Hacienda Drive to serve as a private driveway. The City deemed the application to be incomplete because it did not include a master plan of the area. Nevertheless, the Mayor directed the Council to consider the application. The City denied the application to pave in August 1976 when it adopted Resolutions 203 and 842. The latter resolution stated that the proposed Circulation Element provides that Hacienda Drive remain unpaved and "the proper improved street access is via Round Hill Road." It further stated the land was undeveloped with no utilities and that access "is satisfactory for the use presently being made."

The Sederquists also applied for a variance from the provisions of the zoning ordi-

nance which required a Master Plan and Environmental Impact Report. The City denied the variance when it adopted Resolutions 278 and 841. The landowners lost a state court proceeding for a writ of mandate challenging the denial.

The City insists that the landowners submit a "Master Plan" because their easement to use Hacienda Drive traverses RPD–1 zoned land for one-half mile. At a Board of Adjustments hearing in June 1976, the City's Director of Community Development stated that the City is requiring "a master plan for the entire development of those seven lots and the access, ...." At the same hearing a board member expressed concern to the City Attorney over the propriety of requiring a property owner to "try[ ] to make commitments on properties that you are not in control of." The City Attorney responded that those are problems that arise when there is an "illegal subdivision." Sederquist filed a declaration stating the other lot owners in Hacienda Heights would not cooperate in attempting to develop a master plan. The City's Director of Community Development submitted a declaration stating that the City does not require an application to contain "the signature or approval of other property owners."

In 1976, the City adopted its "Circulation Element." The plan designates the unpaved portion of Hacienda Drive involved in this litigation as an "unpaved all-weather emergency service" road. It states that roads so designated "should" have a locked gate at their junction with paved streets. There is a gate on Hacienda Drive; however, it is not locked. The Circulation Element provides that Round Hill Road should be extended and improved to provide access to residential properties in the area.

On February 11, 1975 the landowners filed a complaint in district court. They alleged inverse condemnation, a denial of due process and equal protection, estoppel, and misrepresentation. The district court abstained from the state law questions. *See Sederquist v. City of Tiburon*, 590 F.2d 278 (9th Cir.1978). After state court proceedings, the landowners returned to federal court for consideration of their federal claims. They expressly reserved those claims for federal court litigation per *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). The court granted the City's motion for summary judgment and denied the landowners' motion for partial summary judgment.

## STANDARD OF REVIEW

■ We review *de novo* a grant of summary judgment. *Lojek v. Thomas*, 716 F.2d 675, 677 (1983). We must determine if there is any genuine issue of material fact and whether the substantive law was correctly applied. Fed.R.Civ.P. 56(c); *Amaro v. Continental Can Co.*, 724 F.2d 747, 749 (9th Cir.1984).

## DISCUSSION

There is one theme that goes primarily to the heart of this dispute—the failure of the landowners to submit a complete application for permission to develop their lots. It is apparent that the district court's decision was based on its belief that the landowners' claim was not ripe because they failed to include a "Master Plan" in their application to pave Hacienda Drive. The landowners challenge this determination as well as the failure of the district court to find the existence of other issues of material fact. If the case is remanded, the landowners request the assignment to a different judge.

1. Requirement of "Master Plan"

■ To provide a "concrete controversy" in a fifth amendment attack on the specific application of zoning regulations, property owners ordinarily must first submit a development plan. *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); *see Martino v. Santa Clara Valley Water District*, 703 F.2d 1141, 1146 (9th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 151, 78 L.Ed.2d 141 (1983). The landowners have not filed an application that contains a "Master Plan." The City insists this failure bars the land-

owners' claims. The landowners argue that this requirement is illegal under California law because it requires "joint action" between the property owners. Additionally, they claim compliance with this condition is impossible because the property owners in Hacienda Heights could not agree on a plan. Contrary to the suggestion of the dissent, the state court proceedings never decided whether the conditions the City is imposing on the Sederquists are a requirement of "joint action" that is illegal under California law.

■ The landowners' argument that the City is imposing an illegal "joint action" requirement is derived from the California Supreme Court decision in *Keizer v. Adams*, 2 Cal.3d 976, 88 Cal.Rptr. 183, 471 P.2d 983 (1970). The plaintiffs in *Keizer* were innocent purchasers of lots in a subdivision where, like here, the grantor had violated the Subdivision Map Act by subdividing the land without filing a subdivision map. The court held that it is "untenable" to require the purchasers to "join with other purchasers of lots in the illegal subdivision and obtain approval by the county of a subdivision map." *Id.* at 980, 88 Cal.Rptr. 183, 471 P.2d 983. The court reasoned that it was unaware of any procedure "by which plaintiffs could compel the other purchasers to join in seeking to correct the illegal acts of their predecessors in interest." *Id.;* see *Wells Fargo Bank, N.A. v. Town of Woodside*, 33 Cal.3d 379, 390, 189 Cal.Rptr. 41, 48, 657 P.2d 819, 826 (1983); *Munns v. Stenman*, 152 Cal.App.2d 543, 314 P.2d 67 (1957).

The "untenable" actions required of the purchasers in *Keizer* are not unlike the "joint action" allegedly required here. In each case the municipality required or is alleged to have required property owners to join together to satisfy a condition precedent to approval of an application to develop their land. There is a close similarity between the required "Master Plan" in this case and the required subdivision map in *Keizer*. In a 1975 letter to the Sederquists, the Deputy City Attorney illustrated this similarity. He stated that the Sederquists must prepare "subdivision maps, (which may be the Master Plan of the area, if you prefer)."

We view the "joint action" argument of the landowners as raising a mixed question of law and fact. Whether the landowners are innocent purchasers, as were the property owners in *Keizer,* is a question of fact. This is the first step in determining the applicability of *Keizer* to this dispute. If they are innocent purchasers, a factual question arises concerning the exact requirements the City is imposing on the landowners. Whether those requirements constitute joint action within the meaning of *Keizer* is a question of law.

We must now determine whether these disputed questions of fact are material to the landowners' claims. This issue pertains to the landowners' ability to file an application to develop their property. Imposition of illegal conditions in the application is material to the landowners' due process claim. The landowners desiring to improve their property may be denied due process. We intimate no view on the merits of that claim.

■ The City's imposition of a "joint action" requirement is also material to the landowners' fifth amendment claim. That amendment, applicable to the states through the fourteenth amendment, *e.g., Penn Central,* 438 U.S. 104, 122, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), provides in part: "nor shall private property be taken for public use, without just compensation." Unlike *Agins,* the contested regulation here is not a general zoning law. See *Agins,* 447 U.S. at 260, 100 S.Ct. at 2141. It is instead a regulation that imposes conditions on the landowners' ability to file an application to have their property developed consistent with the zoning laws. These regulations are not immune to fifth amendment scrutiny. We hold that they are susceptible to a facial challenge. *Cf. Martino v. Santa Clara Valley Water District,* 703 F.2d at 1146–47 (failure to submit a development plan is not a bar to a facial attack on an ordinance) (interpreting *Agins,* 447 U.S. 255, 100 S.Ct. 2138, 65

L.Ed.2d 106 (1980)). This case well illustrates the reasoning—the landowners allege they cannot submit a development plan because the City has imposed conditions in the application stage that are unreasonable and impossible to satisfy.

By facially challenging these conditions the landowners may be able to establish a taking. In *Agins*, the Supreme Court identified two means by which a "taking" may occur:

> The application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests, *see Nectow v. Cambridge*, 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928), or denies an owner economically viable use of his land, *see Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 138 n. 36, 98 S.Ct. 2646, 2666 n. 36, 57 L.Ed.2d 631 (1978).

*Agins*, 447 U.S. at 260, 100 S.Ct. at 2141.

Consistent with the first prong, a "use restriction on real property may constitute a taking if not reasonably necessary to the effectuation of a substantial public purpose." *Penn Central*, 438 U.S. at 127, 98 S.Ct. at 2660 (interpreting *Goldblatt v. Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962)); *see Nectow v. Cambridge*, 277 U.S. at 187–88, 48 S.Ct. at 448. To the extent these regulations are inconsistent with California law, a question arises whether they are "reasonably necessary" to advance the state interest. We do not question the ultimate state interests that Tiburon's zoning ordinance may advance. *See Agins*, 447 U.S. at 261–62, 100 S.Ct. at 2141–42; *see generally Village of Belle Terre v. Boraas*, 416 U.S. 1, 9, 94 S.Ct. 1536, 1541, 39 L.Ed.2d 797 (1974) (permissible reaches of zoning ordinances). We state only that, assuming the law as applied to the factual findings made at trial show the conditions imposed are illegal under California law, those conditions are not "reasonably necessary" to advance those interests. If the landowners can establish that situation, the City may have "taken" the landowners' property.

The dissent misses the point of this reasoning. We do not imply that a city cannot require "proper planning" for utilities, roads, sewers, etc. before a home can be built. We have stated that we do not question the ultimate state interests advanced by Tiburon's zoning ordinance. What we question is the propriety of the means by which Tiburon wishes to achieve this planning. The planning for utilities is wise and perfectly acceptable; the means of achieving that goal is the source of the problem here. Those means may be illegal under California law. If so, they may be preventing the landowners from applying for permits to develop their properties.

■ Concerning the second prong enunciated in *Agins*, the landowners allege that these regulations have deprived them of the economic use of their property. An ordinance may lawfully prohibit the best and most beneficial use of one's property. *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 592, 82 S.Ct. 987, 989, 8 L.Ed.2d 130 (1962). In fact, land use regulations that have "destroyed or adversely affected recognized real property interests" have been upheld. *Penn Central*, 438 U.S. at 125, 98 S.Ct. at 2659. At some point, however, "justice and fairness" require that economic injuries caused by public action be compensated by the government. *Id.* at 124, 98 S.Ct. at 2659. There is no precise formula for determining when a regulation has gone so far as to require compensation. *Id.* This is essentially an *ad hoc*, factual inquiry. *Id.* The crucial factors to be considered are the economic impact of the regulation, particularly the extent to which it interferes with a landowner's investment backed expectation, and the character of the government's action. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432, 102 S.Ct. 3164, 3174, 73 L.Ed.2d 868 (1982); *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659. These factors reveal the existence of other unresolved questions of material fact. The landowners have a right to have these questions answered. Because of our holding

here, we do not consider the landowners' law of the case argument.

## 2. Other Alleged Issues of Fact

Although this discussion disposes of what appears to be the crucial issue, it does not end our task. The landowners argue several other disputed issues of material fact or instances where the district court misapplied the law. We briefly address these arguments to give guidance to the district court should it need to reach these issues.

■ The district court found that it did not have "the slightest doubt but that the property owner fraudulently recorded" the parcel map. The landowners claim that the materials presented to the court do not support this finding and that, at the most, this point raises a genuine issue of material fact. We agree. The map itself shows that the City Engineer certified that the map conformed with section 11575 of the Subdivision Map Act and that the Planning Director certified that the map complied with Chapter 14 of the Tiburon City Code. The map also reveals that the Marin County Recorder recorded the map "at the request of the City of Tiburon." The City Attorney in a declaration, however, states that the City Engineer did not certify the map. In his declaration, David Sederquist denied that he or his wife had anything to do with the recording of the map except paying the five dollar recording fee to the City Engineer. To the extent the City claims the map was fraudulently or mistakenly recorded, there are mixed issues of law and fact that are material to the landowners' claims for inverse condemnation.

■ The landowners also argue that Cal. Govt.Code § 66412.6(b) requires the City to recognize Hacienda Heights as a legal subdivision. That section provides, in pertinent part:

For purposes of this division or of the local ordinance enacted pursuant thereto, any parcel created prior to March 4, 1972, shall be *conclusively presumed* to have been lawfully created if any subsequent purchaser acquired that parcel for valuable consideration without actual or constructive knowledge of a violation of this division or the local ordinance. Owners of parcels or units of land affected by the provisions of this subdivision shall be required to obtain a certificate of compliance or a conditional certificate of compliance pursuant to Section 66499.35 prior to obtaining a permit or other grant of approval for development of the parcel or unit of land.

We find this claim involves other, unresolved issue of material fact. For that statutory provision to apply, there initially must be a finding that the landowners were innocent purchasers for a valuable consideration and that the parcel was created before March 4, 1972. Upon those and any other necessary findings, the district court can then apply to this case the conclusive presumption mandated by the statute. Because the City refuses to recognize Hacienda Heights as a legal subdivision and has filed notices of violation against the landowners' respective properties, the question of the applicability of section 66412.6(b) goes to the use the landowners can make of their property and may affect the marketability of their lots. This inquiry is material to the landowners' inverse condemnation claim. *See Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659; *cf. Richmond Elks v. Richmond Redevelopment Corp.*, 561 F.2d 1327, 1331 (9th Cir.1977) (property rendered unsaleable may constitute compensable "taking").

The landowners claim that the City's Circulation Element "on its face" constitutes a "taking." Specifically, they contend that the Circulation Element's provision that the relevant portion of Hacienda Drive be an unpaved emergency road with a locked gate eliminates their easement over Hacienda Drive. They note that Resolution 842, which denied their request to pave Hacienda Drive, relied in part on the proposed Circulation Element's provision that the drive remain unpaved. They further claim that they do not have alternate access because their easement over Round Hill Road is too narrow to pave and is

clouded by the existence of a one-foot non-access strip that the City must waive. Finally, they point out that the City denied their petition to create an assessment district which would have had the power of eminent domain and could have widened and paved Round Hill Road to meet standards.

The City contends that the landowners have never applied for use of their easement over Round Hill Road. It argues that the Circulation Element is but a general plan that is but tentative in nature and does not amount to inverse condemnation. Therefore, it argues, there is no indication that the City will not allow the landowners to use Hacienda Drive "if and when a proper development plan is submitted."

We have already determined that the landowners may allege a taking based on the conditions imposed by the City on their application. For those same reasons, we further hold that the landowners can challenge the Circulation Element on its face. *Cf. Martino v. Santa Clara Valley Water District*, 703 F.2d 1141, 1146–47 (9th Cir. 1983) (failure to submit a development plan does not bar a facial attack on an ordinance) (interpreting *Agins*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980)).

This decision, of course, does not intimate any views on the success of that challenge. It may be, as the City claims, that the Circulation Element is but a tentative and general plan that does not invade any of the landowners' property rights. *Cf. Selby Realty Co. v. City of San Buenaventura*, 10 Cal.3d 110, 117–20, 109 Cal. Rptr. 799, 803–05, 514 P.2d 111 (1973). Even if the Circulation Element does affect the landowners' property rights, their easement over Round Hill Road must be taken into account. This inquiry necessitates at least the determination of the type of conditions that cloud this easement, and whether the easement meets the City's standards to allow it to be paved. In *Penn Central*, the Supreme Court found that the "transferrable development rights" afforded appellants were "valuable" and mitigated any financial burdens the regulation in question imposed on them. *Penn Central*, 438 U.S. at 137, 98 S.Ct. at 2666. Here the value of the alternative easement similarly must "be taken into account in determining the impact of the regulation." *Id.*

3. District Judge Reassignment

Our inherent power to effectuate the manifest ends of justice provides us with authority to remand cases to a different judge. *Barber v. United States*, 711 F.2d 128, 131 (9th Cir.1983). This power is consistent with our statutory authority to "remand the cause and ... require such further proceedings to be had as may be just under the circumstances," 28 U.S.C. § 2106 (1976); *see Barber*, 711 F.2d at 131. Although reassignment is most frequently done in criminal cases, it is likewise allowed in civil proceedings. *E.g., Barber*, 711 F.2d at 131 (proceeding under Federal Tort Claims Act). We will remand a case to a different district judge only when "unusual circumstances" necessitate reassignment "both for the judge's sake and for the appearance of justice." *Id.*

We refuse here to invoke our powers to assign this case to a different district judge on remand. We do not feel that Judge Schnacke will be unable to preside in a fair manner. Reassignment is also unnecessary to preserve the appearance of justice. Finally, due to the complexities and time already invested in this case, it would be a waste of the district court's effort to require another judge to become familiar with the voluminous materials that already comprise the record in this case. *See generally United States v. Arnett*, 628 F.2d 1162, 1165 (9th Cir.1979) (*quoting United States v. Robin*, 553 F.2d 8, 10 (2d Cir. 1977) (en banc)).

CONCLUSION

The district court erred in granting summary judgment to the City. On remand, the City should lay out exactly what requirements it is placing on the landowners. That strikes this court as a necessary step to ensure a just resolution of this lawsuit.

REVERSED and REMANDED.

FERGUSON, Circuit Judge, dissenting:

Although the majority, by detailing a long series of immaterial facts, attempts to portray this case as one of constitutional dimensions, in fact the case (1) is very simple and (2) does not reach constitutional proportions.

The plaintiffs are the owners of parcels of real estate which previously comprised one parcel. In 1958 and 1959, the previous owners of that parcel divided it into six lots without complying with the California Subdivision Map Act. That Act, Cal.Gov't Code §§ 66410 *et seq.*, states that a split of a parcel into five or more parcels constitutes a subdivision and requires the filing of a subdivision map. *Id.* § 66426. The purpose of a subdivision map is to require real estate developers to divide large parcels into lots which comply in size to zoning ordinances, to dedicate public roads, and to provide for sidewalks, curbs, gutters, water lines, sewers, fire hydrants, and easements for electrical facilities. *See id.* §§ 66418, 66419. The constitutionality of such requirements is no longer open to debate. *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 386–87, 47 S.Ct. 114, 117–18, 71 L.Ed. 303 (1926).

When the plaintiffs acquired their lots, they also received a grant of a 50-foot easement to use a parcel of property called Hacienda Drive for roadway and utility purposes. The easement called Hacienda Drive is not a public road. It has never been dedicated to nor accepted by the city.

The plaintiffs have applied to the city for a permit to pave Hacienda Drive to serve as a private driveway. The city denied the application because plaintiffs' land is undeveloped and the plaintiffs presently have access that is satisfactory for the land's present use. The plaintiffs filed suit in federal court claiming that the city's denial of their paving application constituted a taking of their property without just compensation, in violation of the Fifth and Fourteenth amendments to the United States Constitution. The district court entered summary judgment in favor of the city. I submit that the district court was correct and its judgment should be affirmed.

It is inconceivable that the denial of an application to pave a private driveway constitutes a taking of property. The denial does not affect the applicants' right to use their property in a lawful manner. Plaintiffs' land has been and is now undeveloped and there is no need to pave the private road unless the plaintiffs intend to develop the property. Yet at no time have they applied for a building permit or attempted to use the property for anything other than its present use. Nothing in fact or in law has been taken from them. The utility of plaintiffs' property has not been changed by the denial of a permit to pave a private easement to the property.

In *Kirby Forest Industries, Inc. v. United States,* —— U.S. ——, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984), the Supreme Court summarized the law pertaining to inverse condemnation. It stated:

> The principle that underlies this doctrine is that, while most burdens consequent upon government action undertaken in the public interest must be borne by individual landowners as concomitants of " 'the advantage of living and doing business in a civilized community,' " some are so substantial and unforseeable, and can so easily be identified and redistributed, that "justice and fairness" require that they be borne by the public as a whole.

*Id.* at 2196 (footnotes omitted).

In simple terms, the City of Tiburon has not placed any burden on plaintiffs' property. If and when plaintiffs apply for permits to develop their properties, and the city rejects their applications, a controversy may arise which would then be ripe for adjudication. *See Selby Realty Co. v. City of San Buenaventura,* 10 Cal.3d 110, 117–21, 514 P.2d 111, 115–18, 109 Cal.Rptr. 799, 803–06 (1973).

Long ago, at the commencement of these proceedings, the city filed a notice of *lis pendens.* The Court, in *Kirby Forest Industries,* 104 S.Ct. at 2197, held that im-

pairment of market value of real property incident to otherwise legitimate government action ordinarily does not result in a taking. Thus the filing of a notice of violation by the city cannot in itself state a claim for a taking even though it may cloud the plaintiffs' title. *Cf. Village of Belle Terre v. Boraas,* 416 U.S. 1, 9, 94 S.Ct. 1536, 1541, 39 L.Ed.2d 797 (1974) (zoning ordinances usually have an impact on property value).

The majority, while clouding the simplicity of this case, has also misinterpreted and unwisely expanded California law. In *Keizer v. Adams,* 2 Cal.3d 976, 88 Cal.Rptr. 183, 471 P.2d 983 (1970), the plaintiffs were innocent purchasers of lots in a subdivision where, like here, the grantor had violated the Subdivision Map Act. The court held that the present property owners could not be denied a properly applied for building permit because the grantor had illegally subdivided the land, nor could they be required to join with other property owners to submit a subdivision map of their own. The court held that the building permit application was to be considered "without regard" to the violation of the Subdivision Map Act. 2 Cal.3d at 981, 88 Cal.Rptr. at 186, 471 P.2d at 986.

The city here does not claim that the illegal subdivision forecloses the proper use of plaintiffs' property. Rather, it is simply requiring the plaintiffs to comply with ordinary zoning and building conditions. In *Keizer* the court stated:

> [I]t is equitable that the county be authorized to require that plaintiffs, as a condition to the issuance of a building permit, comply with such reasonable conditions as the county may require in the public interest ... [and] perform or agree to perform or construct such reasonable improvements with respect to plaintiffs' lot as could have been required of plaintiffs' grantor as a condition of subdividing the latter's tract of land under the provisions of the Subdivision Map Act and the county subdivision ordinance

at the time of the sale to plaintiffs of their lot.

2 Cal.3d at 981, 88 Cal.Rptr. at 186, 471 P.2d at 986. *See also* Cal.Gov't Code § 66499.34. Nowhere in *Keizer* is it implied that a city cannot require proper planning for utilities, roads, sewers, and fire hydrants before a house can be built.

Further, the majority ignores that the state courts, interpreting California law, held against the plaintiffs. Six years ago this court ordered that the district court abstain from determining the federal inverse condemnation questions raised by the plaintiffs until state court proceedings had been exhausted. *Sederquist v. City of Tiburon,* 590 F.2d 278 (9th Cir.1978). The plaintiffs went to state court and filed an action which incorporates all the state law allegations set forth in the federal complaint. The state courts in unpublished opinions have determined that plaintiffs do not allege an unlawful taking under state law and that the city properly denied plaintiffs' application to pave. The majority instead of recognizing that six years ago this court required the plaintiffs to exhaust their state remedies and the state courts have ruled that the City has not violated any state law, makes the curious assertion that what the City is doing in this case *"may"* be illegal under California law." The majority for some reason not explained does not want to recognize that the parties have been to state court and there is no illegality under state law.

The district court must be affirmed.