**DEL MONTE DUNES AT MONTEREY, LTD.; Monterey–Del Monte Dunes Corporation, Plaintiffs–Appellants,**

v.

**CITY OF MONTEREY, Defendant–Appellee.**

No. 88–1593.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 16, 1988.

Decided Dec. 12, 1990.

Barbara R. Banke, Law Offices of Jess S. Jackson, San Francisco, Cal., for plaintiffs-appellants.

George A. Yuhas, Orrick, Herrington & Sutcliffe, San Francisco, Cal., for defendant-appellee.

Before HUG, TANG and
BOOCHEVER, Circuit Judges.

HUG, Circuit Judge:

Appellants seek damages and other relief against the City of Monterey for its denial of appellants' application to develop ocean-front property. Appellants allege violations of the Fifth Amendment's takings clause as incorporated in the Fourteenth Amendment, of the equal protection and due process clauses of the Fourteenth Amendment, and of state law. The district court dismissed the takings claim as unripe and the remainder of the claims as both unripe and inadequately stated.[1] The appellants contend that the property owners worked with the city planning staff, the planning commission, and the city council in preparing and refining the plans for a development of the property through five separate applications, meeting the City's objections and reducing the density of the project. The city council then approved a 190–unit development, provided that 15 conditions were met. Appellants contend that they met all of the conditions that were legally possible to fulfill, but the City reneged on its earlier approval of the project, without valid justification, when it denied approval of the tentative map.

### FACTUAL BACKGROUND

The property at issue consists of 37.6 ocean-front acres ("Del Monte Dunes" or "Dunes") located in the City of Monterey, California ("City"). Adjacent to the Dunes are a multi-family residential development, other private property, a railroad right-of-way, and a state beach park. The Dunes were once used as a petroleum tank farm. Seven tank pads and an industrial complex remain on the property. A sewer line housed in 15–foot man-made dunes covered with jute matting and surrounded by snow fencing also traverses the property. The Dunes' native flora includes buckwheat plant, the natural habitat of the endangered Smith's Blue Butterfly. The petroleum company that previously used the Dunes introduced ice plant to help control soil conditions. Ice plant presently covers 25 percent of the Dunes and is slowly increasing, diminishing the natural flora.

Ponderosa Homes owned Del Monte Dunes before the appellants. In 1981, Ponderosa applied for permission to develop the Dunes into 344 residential units. The City rejected this application, and Ponderosa submitted three more applications for 264, 224, and 190 residential units, respectively. The City rejected each of these applications although the type and density of the proposed residential units could potentially have conformed to the City's general land-use plan and zoning ordinances. Ponderosa Homes then submitted a modified plan for development of 190 residential units. While this last application was pending, appellants purchased the Dunes and pursued the application.

Under California law, appellants had to obtain the City's approval of a tentative map in order to develop the Dunes. *See generally* Cal.Gov't Code §§ 66410 to 66499.58 (West 1983 & Supp.1990). A tentative map is a precise drawing detailing the design of a project and the conditions on and around the proposed development

---

1. The City moved to dismiss the complaint and also moved for summary judgment. The appellants filed an amended complaint and responded to the motion for summary judgment with extensive affidavits supporting the factual allegations of the complaint. The order of the district court granted the City's motion to dismiss some of the claims and also granted the motion for summary judgment as to the remaining claims. This adds some complexity to our review, as we would ordinarily look solely to the viability of the allegations of the complaint as to those claims which were dismissed.

In this case, the affidavits actually pertain to all of the claims and simply flesh out the allegations of the complaint. Thus, for simplicity, we consider all claims as having been disposed of by summary judgment. The amended complaint is quite detailed and the affidavits merely provide evidentiary support for those factual allegations. Any factual details added in fleshing out the amended complaint would simply substantiate what the appellants contend they would be able to prove at trial.

site that must be met before a final map can be approved and actual development begun. Typically, an advisory board, such as a local planning commission, reviews a development application initially and recommends acceptance or rejection of a tentative map. *Id.* § 66452.1 (Supp.1990). The local legislative body may then follow or reverse the advisory board by approving, conditionally approving, or denying the tentative map. *Id.* § 66452.2 (Supp.1990). The specific applications filed by Del Monte, including those of its predecessor in title, and the City's responses are detailed in the discussion below.

## PROCEDURAL HISTORY

Appellants' complaint sets out eight separate "claims for relief," only five of which allege substantive violations of state or federal law. The five substantive claims are based on the Fifth Amendment's taking clause as incorporated in the Fourteenth Amendment, the equal protection and due process clauses of the Fourteenth Amendment, and common law principles of estoppel and unjust enrichment. The remaining three claims identify remedies that appellants seek based on the five substantive grounds for recovery. In the remedial claims, appellants request an injunction against the City, relief under 42 U.S.C. § 1983, and declaratory relief under 28 U.S.C. §§ 2201, 2202.

The district court dismissed appellants' taking claim as unripe and the unjust enrichment claim as an impermissible variant of the taking claim. The court also held that the equal protection and due process claims were unripe but alternately dismissed those claims on the merits for failure to state a claim for relief. The court then dismissed the estoppel claim on the merits for failure to state a claim. Finally, the court determined that the remedial claims had no basis independent of the five substantive claims and dismissed the entire complaint. On appeal, appellants have confined their legal and factual arguments to the dismissal of the taking, equal protection, and due process claims. As a result, we do not address the substantive claims for estoppel and unjust enrichment, and we limit our consideration of the three remedial claims to their impact on the constitutional claims.

## ISSUES PRESENTED

1. Whether appellants' constitutional claims under the taking, equal protection, and due process clauses of the Fifth and Fourteenth Amendments are ripe for review.

2. Whether appellants have adequately stated claims for relief under the equal protection and due process clauses of the Fourteenth Amendment.

## ANALYSIS

I. *Ripeness of the Constitutional Claims*

■ Whether appellants' constitutional claims are ripe for review presents a question of law affecting our subject matter jurisdiction. *Shelter Creek Dev. Corp. v. City of Oxnard,* 838 F.2d 375, 377 (9th Cir.), *cert. denied,* 488 U.S. 851, 109 S.Ct. 134, 102 L.Ed.2d 106 (1988). We review the district court's resolution of this question *de novo. Herrington v. County of Sonoma,* 857 F.2d 567, 568 (9th Cir.1988), *modifying* 834 F.2d 1488 (1987), *cert. denied,* 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989).

A. Regulatory Taking Claim

■ Appellants' regulatory taking claim challenges the application of the City's land use regulations to the proposed development of the Dunes. An as applied challenge under the takings clause requires the landowner to establish that the government has (1) taken the landowner's property by imposing regulations that go too far (2) without tendering just compensation for the taking. *Kinzli v. City of Santa Cruz,* 818 F.2d 1449, 1453 (9th Cir.), *modified on other grounds,* 830 F.2d 968 (9th Cir.1987), *cert. denied,* 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 861 (1988). Both the taking element and the compensation element must be ripe before the claim is justiciable. *See Austin v. City and County of Honolulu,* 840 F.2d 678, 679–80 (9th Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988). The City contends

both elements of appellants' taking claim are unripe.

### 1. Ripeness of the Taking Element

The taking component of an as applied claim is not ripe until the local government issues a final decision on the application of land use regulations to the affected property. *Id.* The cases of this circuit and the Supreme Court have identified two areas of concern that illuminate and define the finality requirement. Finality first requires the rejection of development formally sought by the landowner. At a minimum, the landowner must submit one formal development plan and seek a variance from any regulations barring the development proposed in the plan. *Lake Nacimiento Ranch Co. v. County of San Luis Obispo*, 841 F.2d 872, 876 (9th Cir.) (citing *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 187–88, 105 S.Ct. 3108, 3117, 87 L.Ed.2d 126 (1985)) (other citation omitted), *modifying* 830 F.2d 977 (9th Cir.1987), *cert. denied*, 488 U.S. 827, 109 S.Ct. 79, 102 L.Ed.2d 55 (1988). Finality also requires the local government to determine authoritatively the type and intensity of development that land use regulations will allow on the subject property; such a determination helps a court to evaluate whether regulation of the subject property is excessive by identifying the extent of the regulation. *See Herrington*, 857 F.2d at 570; *Lai v. City and County of Honolulu*, 841 F.2d 301, 303 (9th Cir.), *cert. denied*, 488 U.S. 994, 109 S.Ct. 560, 102 L.Ed.2d 586 (1988). Thus, a landowner may need to resubmit modified development proposals that satisfy the local government's objections to the development as initially proposed. *See MacDonald, Sommer & Frates v. County of Yolo*, 477 U.S. 340, 351–53, 106 S.Ct. 2561, 2567–68, 91 L.Ed.2d 285 (1986).

This circuit recognizes a limited futility exception to the requirement that a landowner obtain a final decision regarding the application of land use regulations to the affected property. *Kinzli*, 818 F.2d at 1454. Under this exception, the resubmission of a development plan or the application for a variance from prohibitive regulations may be excused if those actions would be idle or futile. *See Herrington*, 857 F.2d at 570; *Shelter Creek*, 838 F.2d at 379. The landowner bears the burden of establishing, by more than mere allegations, the futility of pursuing any of the steps needed to obtain a final decision. *Herrington*, 857 F.2d at 570. Moreover, before claiming the exception, the landowner must submit at least one development proposal and one application for a variance if meaningful application and submission can be made. *See id.* at 570 & n. 2; *Kinzli*, 818 F.2d at 1455 & n. 6.

The precise test for determining whether a landowner has established the futility of pursuing a development application has not been clearly defined, although various authorities have identified situations that create the potential for application of the exception. In *MacDonald*, for example, the Supreme Court acknowledged that the finality requirement does not compel the landowner to pursue a development application through piecemeal litigation or unfair procedures. 477 U.S. at 350 n. 7, 106 S.Ct. at 2567 n. 7. In *Kinzli*, we explained that futility could be shown by establishing that further pursuit of permission to develop would cause such excessive delay that the property would lose its beneficial use. 818 F.2d at 1454 (discussing *Norco Construction, Inc. v. King County*, 801 F.2d 1143, 1145 (9th Cir.1986)). In *American Savings and Loan Ass'n. v. County of Marin*, 653 F.2d 364 (9th Cir.1981), we discussed the potential futility of requiring resubmission of a development application after prior submissions have been rejected by the local government. We also noted that the Supreme Court has found the submission and rejection of two plans sufficient to ripen a taking claim. *Id.* at 371 (discussing *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 116 & n. 17, 136–38 & nn. 34 & 36, 98 S.Ct. 2646, 2655 & n. 17, 2665–66 & nn. 34 & 36, 57 L.Ed.2d 631 (1978)). Most recently, we excused as futile a landowner's failure to apply for a variance that the local government was powerless to grant. *See Herrington*, 857 F.2d at 570 & n. 2.

In this case, the City does not dispute that appellants have submitted a formal development application that the City has rejected. Nor does the City dispute that applying for a variance from zoning regulations would have been futile in this case. Because the nature and density of appellants' proposed development did not conflict with express terms in the City's zoning ordinances or its general land use plan, a variance would not have led to tentative map approval, and the failure to seek a variance does not affect the ripeness of appellants' claim.

The City does contend, however, that its decision rejecting appellants' development proposal lacks finality under *MacDonald* because the decision merely identified one level of development the City will not permit without establishing the type and intensity of development the City will permit. According to the City, appellants' claim is not ripe until they submit enough proposals to enable the City to pinpoint all the features of an acceptable development project on the Dunes. Only then, claims the City, could a court determine whether the regulations have gone far enough to effect a taking.

The appellants contend that they made successive proposals, adjusting the density, access, and other requirements, to meet the requirements of the professional planning staff, the planning commission and the city council. This culminated in the City's approval of their 190–unit plan with 15 conditions to be met within 18 months. The appellants claim that they substantially met all of these conditions but that the city council abruptly changed its posture and rejected the plan arbitrarily, expressing only generalized conclusory reasons.

It is significant to examine in some detail the application process that was followed by the appellants and their predecessors in interest. As alleged in the complaint and supported by the affidavit of Paul Davis, the architect who had worked with the property owners throughout the entire application process, the following is a description of the process.

In 1981, the property owners submitted an application to the City to develop the property in conformance with the city zoning and general plan requirements. The proposal was for 344 residential units. No commercial or industrial development was proposed although zoning on part of the property would permit it. The 344–unit proposal was within the residential density allowed on the site by the existing zoning and general plan designations. The planning staff requested that an environmental impact report be prepared to assess the potential affects on the environment. The draft of the EIR for the 344–unit project was completed in January of 1982. In August, the planning commission denied the tentative map and planned unit development request for the 344 residential units. At that time, the city planners stated that a proposal for 7 units per acre, or 264 units, would be received favorably. A revised project for 264 units was then submitted. In December of 1983, the planning commission denied the tentative map and planned-unit-development request for the 264 units. At that time, the city planners stated that a proposal for 224 residential units would be received favorably. A revised proposal for 224 units was submitted. In early 1984, the planning commission denied the tentative map and planned-unit-development request for 224 residential units on the property. This decision was appealed to the city council. The city council, in March of 1984, overruled the planning commission's denial and referred the project proposal back to the planning commission with a request that the commission consider a development of 190 units on the property. In July of 1984, the planning commission denied the tentative map and planned-unit-development request for 190 units. This decision was appealed to the city council.

On September 13, 1984, the city council again overruled the planning commission and approved a site plan for the property with 190 residential units. This site plan for 190 units was one of four specific site plans and was known as "scheme D." This was a detailed plan that showed the size and shape of buildings, roads, and open space.

The minutes of the council meeting reflect the following:

On Motion Vreeland, seconded by Canepa and carried by the following Roll Call vote, it was moved the Appeal be granted, that the Council approve the maximum density of 190 units, that the proposed access routes be approved, and that a response from the Fish and Wildlife Service be obtained prior to the Architectural Review Committee and Planning Commission's final approval of the Tentative Map for the development.

AYES: COUNCIL MEMBERS: CANEPA, VREELAND, ROBERSON

NOES: COUNCIL MEMBERS: ALBERT

ABSENT: COUNCIL MEMBERS: HUGHETT

The formal resolution of the city council, Resolution No. 84–160, was adopted and granted an 18–month conditional use permit for the proposed planned unit development. The resolution stated in part:

WHEREAS, the Planning Commission having previously denied the proposed site plan for a 190 unit condominium project at 2301 Del Monte Avenue, the City Council did entertain an appeal therefrom; and

WHEREAS, the City Council does find that the site plan as proposed is conceptually satisfactory and is in conformance with previous decisions of this Council regarding density, number of units, location on the property, and in other respects;

NOW, THEREFORE, BE IT RESOLVED BY THE COUNCIL OF THE CITY OF MONTEREY that the decision of the Planning Commission denying the site plan for this development is hereby overruled, and the site plan known as Scheme D dated August 30, 1984, is hereby approved subject to the conditions of approval attached hereto and incorporated by reference as Exhibit A.

The conditions set forth on Exhibit A were as follows:

1. Conditions mandating conformity with scheme D

2. Submission to the Architectural Review Committee

3. Approval of Smith's Blue Butterfly habitat preservation by California Department of Fish and Game and U.S. Fish and Wildlife

4. Protection of rare plants

5. Approval of Access

6. Approval of Fencing

7. Approval of Grading

8. Underground Utilities

9. Approval by Fire Department

10. Approval by Department of Public Works

11. Approval of Homeowners Association Agreement

12. Soundproofing between units

13. Payment of Park Dedication Fee

14. Provision of moderate income housing

15. Duration of Use Permit

It is noteworthy that the council found that the proposed plan was conceptually satisfactory and in conformance with previous decisions of the council regarding density, number of units, location on the property, and in other respects, as stated in the resolution.

The minutes of the meeting also indicated that the access was approved. The project as it was originally proposed provided for access to the property along Front Street, which is on the ocean-side of the property. The City had preferred that this access road be dedicated as open space as a part of the beach and, therefore, the city public works director had suggested and the City approved an access route from Del Monte Avenue across the railroad right-of-way controlled by the City. This was the access provided in "scheme D," which was approved in the September 13, 1984 meeting.

The property owners then set about revising the project to accord with city council Resolution No. 84–160. In July of 1985, the Architectural Review Committee gave concept approval to the site plan. This was a detailed approval as to the number of bedrooms in each unit, the exterior design, the square footage of each building, the

size and shape of the roads and parkways, and the number, size, and shape of the parking facilities. In August of 1985, the planning commission held a hearing on the tentative map for the 190–unit project. The report of the professional planning staff recommended that the project be approved, stating that "it appears that the conditions of approval have been addressed and substantially met by the applicants' tentative map." The planning staff report further recommended that the planning commission make findings that:

1. The design or improvement of the proposed subdivision is consistent with the objectives, policies, general land uses, and programs of the City's adopted General Plan and Del Monte Land Use Plan.
2. The site is physically suitable for the type and density of the proposed development.
3. The design or improvements of the proposed subdivision are not likely to cause substantial environmental damage or substantially and avoidably injure fish or wildlife or their habitat.
4. The design of the subdivision or the type of improvements is not likely to cause serious public health problems.
5. The design of the subdivision or the type of improvements will not conflict with easements acquired by the public at large for access through or use of property within the proposed subdivision.

At a meeting in January of 1986, the planning commission acted against its professional staff's recommendation and denied the tentative map for the 190 units. Less than two months remained before the expiration of the 18–month use permit for the project. The property owners appealed this decision to the city council. They also sought a 12–month extension of the use permit in order to attempt to comply with additional requirements that might be imposed. The use permit was extended but only until the hearing before the city council on June 3, 1986. At this time, the city council denied the 190–unit tentative map and adopted Resolution No. 86–96 which stated:

WHEREAS, the City Council held a duly noticed public hearing on May 6, 1986, continued to June 3, 1986, at which time testimony was received regarding the application for a Tentative Subdivision Map for Monterey Bay Dunes Project, 2301 Del Monte Avenue, Monterey, a 190–unit planned unit development;

NOW, THEREFORE, BE IT RESOLVED THAT THE COUNCIL OF THE CITY OF MONTEREY FINDS:

1. The site is not physically suitable for the type and density of development proposed, in that sand relocation and grading necessary for construction of the project results in significant environmental impacts that are not mitigable nor adequately addressed given the current size of the project.

2. The site is further not physically suitable for the type and density of development proposed in that significant impacts upon the native flora and fauna habitat will result which are not adequately mitigated in this proposal.

3. The site is further not physically suitable for the project proposed in that the design of the subdivision does not provide adequate access to and from the property over lands owned or controlled by the developer, and as proposed the project fails to provide adequate easements or other legally acceptable means of insuring access to this project in the future.

4. The design of the subdivision, as noted in 2 and 3 above, is likely to cause substantial environmental damage and substantially injure the habitat of the endangered Smith's Blue Butterfly.

5. The project as submitted is not in conformance with the General Plan, in that it fails to protect important native flora and fauna as required in Policy 10, page B–6.

6. The project will have a significant effect on the environment, and no demonstration of overriding considerations has

been made which would support approval of this project.

PASSED AND ADOPTED BY THE COUNCIL OF THE CITY OF MONTEREY this 17th day of June, 1986, by the following vote:

AYES: COUNCILMEMBERS: CANEPA, VREELAND, ROBERSON
NOES: COUNCILMEMBERS: ALBERT
ABSENT: COUNCILMEMBERS: OUTZEN

We note that the vote of the council members present was identical for this resolution to that of the resolution passed on September 13, 1984, with the same three members voting for the resolution and the same member voting against.

The appellants contend that the council's findings in Resolution No. 86–96 were in direct contradiction to those previously made in Resolution No. 84–160, and that the denial was arbitrary, capricious, and unreasonable. They state that after 20 months of working with the professional staff in fulfilling the conditions of the special use permit that had been set forth by the City, the City now denied the tentative map approval for reasons completely contradictory of their former decision without any basis in fact. They allege that the City's purported reasons for denial did not reflect the real reason for their opposition and that the real reason was their "wish, scheme, and intent to preserve and devote plaintiffs' property as open space or quasi open space without paying plaintiffs the required just compensation."

Let us first examine the specific 15 conditions the City set forth. The City's own professional planning staff concluded that all of the conditions had been addressed and substantially met. The city council did not base its denial upon failure to meet any of the specific numbered conditions. The generalized findings do point to three areas of dissatisfaction.

Paragraph 1 of Resolution No. 86–96 specifies that sand relocation and grading necessary for construction created unsatisfactory environmental problems. The affidavit of architect Davis states that this is erroneous because he had modified the project plans so that no sand relocation was required. The city council did not base this conclusion on any facts brought out by its staff or at the hearing, and the City does not advance this argument on appeal.

Paragraph 3 of the resolution asserts that the plan does not provide adequate access over lands owned or controlled by the developer. Appellants point out that the original plans did have access over its own property from Front Street, the road adjacent to the beach, but that the City had requested this access not be utilized and that access be planned from Del Monte Avenue, over the abandoned railroad right-of-way controlled by the City. The property owners did so. The minutes of the September 13, 1986 meeting reflected that the city council approved this access, as shown in scheme D for the 190–unit plan. Now the City refuses to allow the appellants to use this access and requires that access must be provided over the land of a neighboring owner. The appellants contend that this is an illegal requirement, citing *Sederquist v. City of Tiburon*, 765 F.2d 756 (9th Cir.1984). Even more telling, however, is the fact that appellants contend that they would have been able to obtain such an easement and revise their plan had the City been willing to grant an extension to comply with this shift of its position. The city council refused to grant an extension.

The other objection reflected in the City's findings in the remaining paragraphs relates to the provisions in the plan to preserve the habitat for the Smith's Blue Butterfly. First, we note that the City's professional planning staff had determined that this condition had been substantially met. Condition number 3 of the 84–160 resolution required

Approval of Smith's Blue Butterfly habitat preservation by California Department of Fish and Game and U.S. Fish and Wildlife.

The appellants allege that the approval of these agencies could not be obtained only because it was the policy of the agencies not to render decisions formally approving compliance with such conditions. The federal agency only gives such advice to feder-

al agencies. The appellants do point out that the U.S. Fish and Wildlife Service had earlier indicated to the Federal Housing Authority that it had no objection to the manner in which the habitat was preserved.

The City did not base its objection on the failure to secure these approvals but rather on the generalized failure to provide adequate provision for the habitat of the Smith's Blue Butterfly. The substantive inquiry is really whether the plan did make adequate provision for the protection of the habitat. The appellants point out that they devoted 17 acres to the preservation and restoration of the buckwheat plant, which is the habitat for the butterfly, even though no one has ever seen a Smith's Blue Butterfly on the property. The plan provided for restoration of the buckwheat in areas in which the ice plant had taken over, thus improving the habitat. Appellants note that left in its present state without any development, the ice plant would continue replacing the buckwheat and, thus, eventually destroy the natural habitat for the butterfly.

In summary, the allegations of the appellants, supported by affidavits provided to the court, show the following. Appellants and their predecessors in interest have been seeking development permission from the City since 1981. The city council finally specified in 1984 the development it would permit on the property. The appellants spent over 18 months preparing a plan to meet the conditions specified. The plan was approved in the architectural review, was recommended by the City's professional planning staff, and then the same three members of the city council that had approved the development with certain conditions abruptly changed course and disapproved the plan even though the conditions specified had been substantially met. The City now appears to expect appellants to submit a fresh application rather than continue refining the plan into which appellants have expended significant resources. This disapproval of the plan came at a time when a sewer moratorium from another agency would prevent development based on new plans, thus, further delaying or restricting development.

Requiring appellants to persist with this protracted application process to meet the final decision requirement would implicate the concerns about disjointed, repetitive, and unfair procedures expressed in *MacDonald*, 477 U.S. at 350 n. 7, 106 S.Ct. at 2567 n. 7, and *American Savings and Loan*, 653 F.2d at 371. The City, after extended processes, set forth the development it would permit, with express conditions. Appellants have provided evidence that they substantially fulfilled these conditions. We therefore conclude that further reapplication is not required and that the taking component of appellants' claim is sufficiently ripe for review.[2]

### 2. *Ripeness of the Compensation Element*

▬▬▬ "The Fifth Amendment does not proscribe the [mere] taking of property; it proscribes taking without just compensation." *Williamson County*, 473 U.S. at 194, 105 S.Ct. at 3120 (citation omitted). Until a landowner has been denied just compensation by the state, no constitutional violation occurs. *Id.* at 194 n. 13, 105 S.Ct. at 3120 n. 13. Consequently, the compensation component of a taking claim is not ripe until the local government refuses to compensate the landowner for the taking. *MacDonald*, 477 U.S. at 350, 106 S.Ct. at 2566. Furthermore, a landowner must affirmatively seek compensation from the state if adequate procedures are available. *Kinzli*, 818 F.2d at 1455. A land-

---

**2.** This case is distinguished from our recent decision in *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 911 F.2d 1331 (9th Cir.1990) (per curiam), wherein we held certain claims not to be ripe. *See id.* at 1336. In that case, the property owners had made no effort to utilize the administrative remedy of seeking an amendment to the 1984 Regional Plan, although a provision of that plan requires the Tahoe Regional Planning Agency to consider requests for amendment. In the case before us, the property owners made repeated efforts to utilize available administrative remedies, and only resorted to the courts when their substantial compliance with the administrative procedures the City had specifically outlined was frustrated by the City's abrupt change of course.

owner who seeks to sue in federal court before seeking compensation from the state "bears the burden of establishing that state remedies are inadequate." *Austin*, 840 F.2d at 680 (citation omitted). A landowner fails to discharge this burden by showing that state procedures are untested or uncertain. *See Bateson v. Geisse*, 857 F.2d 1300, 1306 (9th Cir.1988) ("Until the state courts establish that [the landowner] may not obtain just compensation through an inverse condemnation action under any circumstances, [the state] procedures are adequate....") (citation and internal quotations omitted); *Austin*, 840 F.2d at 681 (landowner required to sue in state court where no state case law either recognized or rejected inverse condemnation as a remedy for regulatory takings).

The district court determined that appellants "had shown nothing more than the uncertainty of California compensation procedures for regulatory takings." The court then concluded that appellants had to repair to state court and test those procedures before their taking claim would be ripe for federal review. Appellants assign error because the district court evaluated the availability of California's compensation procedures at the wrong point in time. We agree with appellants.

 After appellants filed this action, the Supreme Court expressly held that the Fifth Amendment requires states to compensate regulatory takings. *See First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 317–22, 107 S.Ct. 2378, 2387–90, 96 L.Ed.2d 250 (1987). The Court's decision in *First English* is irrelevant to the ripeness inquiry here, however, because the time at which the taking occurs is the appropriate period for measuring the adequacy of a state's compensation procedures. *Hoehne v. County of San Benito*, 870 F.2d 529, 533–34 (9th Cir.1989); *Sinaloa Lake Owners Ass'n. v. City of Simi Valley*, 882 F.2d 1398, 1402 (9th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990). *See also Williamson County*, 473 U.S. at 194, 105 S.Ct. at 3121 ("all that is required is that a reasonable, certain and adequate provision for obtaining compensation exist at the time of the taking") (internal quotations omitted). When the City rejected appellants' last development application, California law did not permit landowners to seek compensation for a regulatory taking through an action in inverse condemnation; their sole remedy was to seek invalidation of the offending regulations through mandamus or injunctive relief. *See Agins v. City of Tiburon*, 24 Cal.3d 266, 274–78, 157 Cal.Rptr. 372, 376–78, 598 P.2d 25, 29–31 (1979), *aff'd on other grounds*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), *abrogated by, First English*, 482 U.S. 304, 107 S.Ct. 2378 (1987). As a result, California's compensation procedures were inadequate when the alleged taking occurred, and appellants have established the ripeness of the compensation component of their regulatory taking claim. Because both the taking and compensation elements are ripe, we reverse the district court's dismissal of that claim.

### B. Due Process and Equal Protection Claims

 In evaluating the ripeness of due process or equal protection claims arising out of the application of land use regulations, we employ the same final decision requirement that applies to regulatory taking claims. *Hoehne*, 870 F.2d at 532; *Shelter Creek*, 838 F.2d at 379; *Kinzli*, 818 F.2d at 1455–56; *Norco*, 801 F.2d at 1145. Our conclusion that appellants have met the final decision requirement by showing the futility of reapplication compels the conclusion that appellants' equal protection and due process claims are ripe for review.

### II. *Merits of Due Process and Equal Protection Claims*

 In dismissing appellants' due process and equal protection claims, as amended, for failure to state a claim, the district court considered the affidavits and exhibits the parties had submitted in support of and in opposition to the City's first motion to dismiss. Thus, we treat the dismissal as an order granting summary judgment under Fed.R.Civ.P. 56(c). *See* Fed.R.Civ.P. 12(b);

*Fort Vancouver Plywood Co. v. United States*, 747 F.2d 547, 552 (9th Cir.1984). We review orders granting summary judgment *de novo* and apply the same standard that guides the district court. *Darring v. Kincheloe*, 783 F.2d 874, 876 (9th Cir.1986). Accordingly, we must determine, viewing the evidence most favorably to appellants, whether appellants have shown any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

### A. Due Process

▆▆▆ In order to establish their substantive due process claim, appellants must show that the City's decision to deny tentative map approval and to refuse an extension of the conditional use permit was arbitrary and irrational. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976); *Bateson*, 857 F.2d at 1303; *Barancik v. County of Marin*, 872 F.2d 834, 836 (9th Cir.1988), *cert. denied,* — U.S. ——, 110 S.Ct. 242, 107 L.Ed.2d 193 (1989). In this type of action, where the property owner contends that it has been unconstitutionally deprived of property through governmental regulation, motions to dismiss and motions for summary judgment must be viewed with particular skepticism. *See Sinaloa Lake Owners Ass'n*, 882 F.2d at 1401. The importance of the specific facts and circumstances relating to the property and the facts and circumstances relating to the governmental action militate against summary resolution in most cases.

▆▆▆ Here, the appellants' allegations, supported by affidavits, are that the city council had given approval to the 190–unit project, with 15 conditions that appellants substantially met and that the City's professional planning staff agreed they had substantially met; yet the same members of the city council abruptly changed course and rejected the plan, giving only broad conclusory reasons. Appellants contend that they presented evidence sufficient to survive summary judgment, that the action of the city council was not for valid regulatory reasons, but that it was an action to forestall any reasonable development of the property. The assertion of the appellants is that this was arbitrary and irrational action that was motivated, not by legitimate regulatory concerns, but by political pressure from neighbors and other residents of the city to preserve the property as open space. We cannot say at this stage of the proceeding that the actions of the city council, which we have detailed above, were not arbitrary and irrational and, thus, a violation of appellants' substantive due process rights. This issue must await determination after a trial on the merits.

### B. Equal Protection

▆▆▆ Appellants contend that the City's rejection of the development proposal violates the equal protection clause because other properties surrounding the Dunes have been developed into residential units similar to the development proposed by appellants but without the environmental and access conditions imposed by the City. Such municipal decisions are presumptively constitutional and, therefore, need only be rationally related to a legitimate state interest, unless the distinctive treatment of the party involves either a fundamental right or a suspect classification. *See City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976); *Boone v. Redevelopment Agency*, 841 F.2d 886, 892 (9th Cir.), *cert. denied*, 488 U.S. 965, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988). Because no suspect classification or fundamental right is involved in Del Monte's equal protection claim, the question is whether the City had a rational basis for treating Del Monte differently from other property owners.

▆▆▆ Under this test, the district court's dismissal of the equal protection claim on the merits is subject to the same difficulty as that identified in our discussion of the due process claim. The allegations, supported by affidavits, are adequate to state a claim if proved at trial. The allegations are that the City arbitrarily and unreasonably limited use and development of this property and set aside open space for public use, whereas owners of comparable

property along the Monterey Bay were not subjected to these conditions and restrictions. They also contend that the appellants were singled out to bear the burden of the City's attempt to bring back the Smith's Blue Butterfly by creating a "butterfly park" on the majority of the appellants' land. They note that this type of equal protection claim was recognized by the Supreme Court in *Nollan v. California Coastal Commission*, 483 U.S. 825, 835, 107 S.Ct. 3141, 3147, 97 L.Ed.2d 677 (1987). In that case, the California Coastal Commission had required that a private property owner provide a public easement to the beach as a condition for granting a building permit. The Court noted that, even assuming the legitimacy of the purpose for the requirement, the action might violate the equal protection clause if the property owner were singled out to bear the burden of remedying the problems California sought to correct. The Court stated:

> If the [property owner] were being singled out to bear the burden of California's attempt to remedy these problems, although they had not contributed to it more than other coastal landowners, the State's action, even if otherwise valid, might violate either the incorporated Takings Clause or the Equal Protection Clause.

*Id.* at n. 4. Although the objective of preserving a habitat for the Smith's Blue Butterfly is rational, it may not be rational to single out this parcel to provide it. *Id.* Genuine issues of material fact remain to be determined. As in the case of the substantive due process claim, the facts established at trial could bear out the contentions of the appellants that they had been deprived of their equal protection rights. *See Herrington*, 834 F.2d at 1501 (upholding jury verdict based in part on equal protection claim).

### CONCLUSION

The claims of the appellants for unconstitutional taking, due process and equal protection violations are ripe for trial. Appellants have raised in their complaint and supporting affidavits contentions and questions of fact sufficient to overcome summary judgment on these claims. We therefore reverse the judgment of the district court as to these claims and also reverse the dismissal of the remedial claims for injunctive relief, for declaratory relief under 28 U.S.C. § 2201–02 (1988), and for relief under 42 U.S.C. § 1983 (1982). We affirm the dismissal of appellants estoppel and unjust enrichment claims.

AFFIRMED in part, REVERSED in part, and REMANDED.