Filed 7/19/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| LAFAYETTE BOLLINGER DEVELOPMENT LLC et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> TOWN OF MORAGA et al., <br><br> Defendants and Appellants. | A163636, A164395 <br><br> (Contra Costa County Super. Ct. No. MSN19-0241) |

For several reasons, including safety and environmental concerns, the Town of Moraga denied an application by Lafayette Bollinger Development LLC, Joan Bruzzone, and David Bruzzone (collectively, the Bruzzones) to develop housing on their 186-acre property (the property). As part of the application, the Bruzzones unsuccessfully sought to amend the property's land-use designation, which has been "Study" since Moraga adopted its first general plan in 1979 (the Study designation).

The Bruzzones petitioned for a writ of mandate and brought other claims against Moraga and its town council (collectively, Moraga or the town). The trial court issued a peremptory writ of mandate directing Moraga to give the property a legally compliant land-use designation, but it otherwise rejected the Bruzzones' claims and entered judgment in favor of Moraga. It also granted Moraga's motion to strike and tax the Bruzzones' costs and

1

denied the Bruzzones' motion for attorney fees. The Bruzzones appealed, and Moraga cross-appealed from the writ.

The Bruzzones' primary claim on appeal is that the Study designation violates Government Code section 65302, subdivision (a) (section 65302(a)), which establishes requirements for a general plan's land-use element.[1] The Bruzzones contend that as a result of the designation's illegality, Moraga's "entire land use element [was] out of compliance" and the town was unauthorized to "consider[] development applications." Thus, they claim they are entitled to a writ requiring the town to reconsider their application after it gives the property a compliant designation. Moraga does not contest that the Study designation is legally invalid, but it nevertheless claims in its cross-appeal that the trial court erred by granting any writ relief.

We reject both parties' arguments and affirm the writ of mandate the trial court issued. In doing so, we agree with the court that the lack of a legally compliant land-use designation alone did not preclude Moraga from denying the project application for unrelated reasons, none of which the Bruzzones challenge. We also reject the Bruzzones' remaining contentions that the trial court wrongly rejected their non-writ claims for inverse condemnation, equal protection and due process, and declaratory relief, and that it improperly denied them their costs and attorney fees. Accordingly, we affirm the judgment and the orders denying the Bruzzones their costs and attorney fees.

---

[1] All further statutory references are to the Government Code unless otherwise noted.

2

# I.
## FACTUAL AND PROCEDURAL
## BACKGROUND

The property, known as Bollinger Valley, is in a rural area of Moraga near St. Mary's College that "is characterized by open space, agricultural uses, and low-density residential development." The property "is surrounded by hills . . . and not visible from major roads and highways in the surrounding urbanized areas." Much of the property is sloped; about half of the proposed project site has grades over 20 percent, and "significant portions" have grades over 35 percent. The property is used for cattle grazing and a summer equestrian day camp.

Joan Bruzzone and her now-deceased husband purchased an interest in the property in 1967 and took full ownership in 1977. She later conveyed the property to Lafayette Bollinger Development LLC, a California limited liability company that both she and David Bruzzone, another "member[] of the Bruzzone [f]amily," participate in running.

Before Moraga was incorporated as a city in 1974, the property was part of unincorporated Contra Costa County. The property's zoning designation "allowed residential development with a density of approximately three dwelling units per acre," equating to over 500 units. Upon incorporating, Moraga retained the County's zoning designation for the property.

Five years later, in 1979, Moraga adopted its first general plan. All the land within its boundaries was designated into one of three categories— "Residential," "Commercial," or "Parks and Open Space." The property was put in the latter category and denominated "Public Open Space – Study." The following year, Moraga adopted a zoning ordinance under which the

3

property was likewise designated as "Study." Under this designation, the permitted uses were "[a]griculture and accessory buildings thereto."

Although originally meant to be temporary "while the planning agency conduct[ed] detailed studies," the Study designation remained in place for the next two decades. An updated general plan adopted in 1990 designated the property as "Study Area," and it was no longer included in the "Parks and Open Space" category. In a letter to the town planning commission before this update, David Bruzzone objected that Moraga "ha[d] failed to change the property to the appropriate zoning and [his] family ha[d] been deprived of the use of the property."

Moraga adopted its current general plan in June 2002. Before doing so, the town considered changing the property's land-use designation to "non-MOSO open space."[2] The Bruzzones objected to this change, proposing instead that the property's designation remain the same and the town "authorize a professional [planning] study that would be paid for by [the Bruzzones]." Subsequently, a staff report stated that maintaining the Study designation would not be "a significant disadvantage" for Moraga, given that the development standards for either that designation or the non-MOSO open space designation would be similar, and "[t]he information that would be gained by the [t]own at the property owners['] expense" while the Study designation continued "would be very beneficial to the [t]own as it considers the orderly development of this property." Thus, the report recommended "retaining the [S]tudy designation for a period not to exceed two years."

---

[2] The Moraga open space ordinance (MOSO) is a voter initiative passed in the mid-1980's that limits the density of development on certain land designated as open space. (See Moraga Mun. Code, ch. 8.52; *Northwood Homes v. Town of Moraga* (1989) 216 Cal.App.3d 1197, 1200.)

4

In line with this recommendation, the general plan adopted in 2002 designated the property as "Study Area."  The land-use element of the plan explained that "[d]ue to the special character of the Bollinger Canyon area, its unique development issues, and its status as one of the few remaining areas of development potential in the [t]own, the . . . [a]rea will be the subject of a 'special study' conducted by area property owners to document the site's opportunities and constraints and define a conceptual plan of development consistent with the [general plan's] goals and policies."  The contemplated "Bollinger Canyon Special Study" was to include a "Conceptual Development and Conservation Plan [(CDC Plan)] . . . to illustrate how the site could be developed in a manner consistent with the [general plan's] goals and policies," which would have various elements, including proposed land-use designation(s) and proposed general plan amendments as necessary "to ensure ongoing consistency between the proposed development and the [general plan]."  An appendix to the general plan noted that the special study, which was to be developed with Moraga's support, was scheduled to be "[c]omplete by December 2004."

In late 2003, the Bruzzones submitted a report that included "the findings of a year-long planning and engineering analysis" of the property, a CDC Plan describing a proposed project of 126 single-family homes, and "a formal application to amend the [general plan]" to change the Study designation and accompanying zoning.  Specifically, the Bruzzones sought to change the designation to (1) residential – two dwelling units per acre for 92 acres of the property and (2) non-MOSO open space for the remaining acres.

Under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), the project required an environmental

impact report (EIR), to be paid for by the Bruzzones. A draft EIR was begun in the mid-2000's but not released until February 2013.[3] The draft EIR evaluated the proposed 126-home project as well as five less dense alternatives of "no project," 8 homes, 37 homes, 100 homes, and 121 homes.

In the same period, Moraga developed "Hillsides and Ridgelines regulations" (Hillside Regulations) to limit development on the town's hillsides. In response to the Bruzzones' concern that the Hillside Regulations "would preclude approval and implementation of any otherwise feasible housing project on the . . . property," Moraga exempted their project from the new regulations, which were officially adopted in April 2018. The exemption provided, however, that "once any pending development project application has been acted upon by the final reviewing body or is withdrawn by the applicant, this exemption shall no longer apply to any such application."

Meanwhile, a final EIR was published in January 2017. That summer, the Bruzzones submitted a revised project of 85 homes (the project), which required revisions to the EIR. A revised final EIR was published in September 2018, and the following month a hearing on the project was held before the planning commission. The planning commission recommended that the town council deny the Bruzzones' application and, as a result, not certify the EIR. The planning commission also recommended that the town council "strongly consider" a 37-home alternative project.

---

[3] The parties disagree about the causes of this delay. Part of it was due to competing voter initiatives in 2008 to reclassify the property. One initiative would have designated the whole property as open space. The other, which the Bruzzones proposed in response to the first initiative, would have designated part of the property as open space and the other part as residential – two dwelling units per acre. Neither initiative passed.

6

The Bruzzones appealed the planning commission's decision. In November 2018, after a public hearing, the town council denied the appeal and adopted the planning commission's recommendations. In doing so, the council denied the request for a general plan amendment and accompanying rezoning and affirmed that the proposed land-use designation for the 85-home project was not consistent with the general plan "based on public safety, residential density, grading volumes, location of proposed development relative to the site, and impacts to natural resources." Primary concerns included the large amount of grading required, which contravened policies to preserve natural topography; problems with fire department access, which contravened policies requiring a fire station within one and a half miles and three minutes driving time and certain access-road characteristics; and the inadequacy of public services, since the property was outside the existing water-utility service area.

The town council also denied the application to build the project. It found that the project would be inconsistent with the general plan for the reasons stated above, as well as for other reasons involving the building of homes on and near ridgelines. In turn, because it had denied the project, the council concluded it was unnecessary to certify the EIR. In particular, the council found that the 85-home proposal was inconsistent with the general plan and posed many of the same problems discussed above, including obstacles to emergency vehicle access.

The Bruzzones filed this lawsuit in February 2019. The operative complaint alleged causes of action for inverse condemnation, violations of federal due process and equal protection, and declaratory relief, as well as a

7

cause of action petitioning for a writ of mandate.[4]  Moraga answered the complaint, but delays occurred in obtaining the administrative record, and briefing was not completed until December 2020.  The parties stipulated that after a hearing on the merits, all the claims could be decided based on the administrative record and certain other documents.

The hearing occurred over two days in January and April 2021, and afterward the parties submitted supplemental briefing.  In May, the trial court issued a 29-page statement of decision in which it denied relief to the Bruzzones, except that it concluded a writ should issue directing Moraga to give the property a land-use designation other than Study.  Two months later, the court issued a peremptory writ of mandate and a judgment in Moraga's favor on all causes of action except the portion of the writ claim on which the Bruzzones prevailed.  The Bruzzones appealed, and Moraga cross-appealed.

Subsequently, the Bruzzones sought approximately $95,000 in costs, almost all of which were for preparing the administrative record, and approximately $720,000 in attorney fees.  The trial court granted Moraga's motion to strike and tax the Bruzzones' costs and denied the Bruzzones' motion for attorney fees.  The Bruzzones appealed those rulings, and we consolidated that appeal with the parties' prior appeal.

II.
DISCUSSION

A.    *The Trial Court Properly Resolved the Writ Cause of Action.*

The trial court identified several decisions by Moraga that were "encompassed within" the writ cause of action, including:  (1) denying the

---

[4] The complaint also alleged a cause of action under CEQA, based on approval of the Hillside Regulations.  On appeal, the Bruzzones do not challenge the trial court's denial of that claim.

project application; (2) failing to give the property a land-use designation; (3) denying the proposed amendment to the general plan; and (4) allegedly applying the Hillside Regulations to the project despite the exemption. The court concluded that Moraga's failure to assign a proper land-use designation for over 40 years constituted an abuse of discretion, but the remaining decisions did not.

The Bruzzones claim that Moraga's failure to comply with section 65302(a) was illegal as a matter of law, not merely an abuse of discretion, "undermin[ing]" the trial court's decision on the remaining aspects of the writ cause of action. According to the Bruzzones, because the Study designation violated section 65302(a), Moraga was unable to "reject the [a]pplication for a conceptual plan without first bringing its general plan into compliance with [the statute]." In other words, they maintain that Moraga could not validly take *any* action on their application because the general plan did not comply with section 65302(a). Thus, they contend they are entitled to a writ requiring the town "to vacate its denial of the [a]pplication[], take action to bring its general plan into compliance with the law[,] and then reconsider the [a]pplication[]" without applying the Hillside Regulations.

Moraga does not contest that the Study designation violated section 65302(a). But the town claims that not only could it validly deny the Bruzzones' application with the Study designation in place, a writ should not have issued to require it to adopt a new designation.

We reject both parties' claims. Although we disagree with Moraga that the Bruzzones' claim is procedurally barred, the absence of a compliant land-use designation did not prevent Moraga from denying the project application on other grounds, none of which the Bruzzones challenge. At the same time,

9

we conclude that the trial court properly issued a writ directing Moraga to adopt a new designation for the property. Therefore, Moraga is not entitled to relief on its cross-appeal.

### 1.   Standard of review

"The nature of the administrative action or decision at issue determines which type of review applies," that under Code of Civil Procedure section 1085 (ordinary mandate) or Code of Civil Procedure section 1094.5 (administrative mandate). (*Martis Camp Community Assn. v. County of Placer* (2020) 53 Cal.App.5th 569, 593.) "In general, administrative mandate . . . is used to review the validity of quasi-judicial decisions resulting from a proceeding in which (1) a hearing was required to be given, (2) evidence was required to be taken, and (3) discretion in the determination of facts was vested in the agency." (*Ibid.*) Ordinary mandate "is used to review ministerial acts, quasi-legislative acts, and quasi-judicial decisions which do not meet the requirements for review under Code of Civil Procedure section 1094.5." (*Ibid.*)

Under Code of Civil Procedure section 1094.5, the question is whether the agency "has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).) Under Code of Civil Procedure section 1085, the question is "whether the agency's action was arbitrary, capricious, entirely lacking in evidentiary support, or failed to follow the procedure required by law." (*Martis Camp Community Assn. v. County of Placer*, *supra*, 53 Cal.App.5th at pp. 593–594.)

10

Here, the record is ambiguous as to which form of writ relief the Bruzzones sought or the trial court granted, and the parties do not directly address the issue.[5]  Although this litigation predominantly involves Moraga's quasi-judicial decisions about a specific property, a general plan's legal adequacy is usually reviewed through ordinary mandate.  (See *San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 509; *Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1195.)  Thus, the Bruzzones' writ cause of action challenges "both legislative and adjudicative functions" performed by Moraga.  (*Dominey v. Department of Personnel Administration* (1988) 205 Cal.App.3d 729, 738; see, e.g., *Swallow v. California Gambling Control Com.* (2022) 77 Cal.App.5th 1037, 1044; *Schmid v. City and County of San Francisco* (2021) 60 Cal.App.5th 470, 483–484.)  We conclude that to the extent the Bruzzones seek to overturn Moraga's denial of the project application, the writ petition sounds in administrative mandate, and to the extent they seek to require Moraga to adopt a valid land-use designation for the property, it sounds in ordinary mandate.

In any case, the differences between the two forms of mandate have little impact on the appellate challenges to the trial court's disposition of the writ petition.  (See *Friends of the Old Trees v. Department of Forestry & Fire*

---

[5] The writ cause of action did not identify whether the Bruzzones sought a writ of ordinary mandate or administrative mandate, and the parties' briefing below and the statement of decision referred to both sections 1085 and 1094.5 of the Code of Civil Procedure.  The peremptory writ itself is silent on the issue, and the judgment states that the Bruzzones prevailed on a portion of their cause of action "for a writ of administrative mandamus."  Finally, on appeal, the Bruzzones cite only Code of Civil Procedure section 1085 in briefing the writ-related issues, and Moraga cites both statutes.

11

*Protection* (1997) 52 Cal.App.4th 1383, 1389 ["no practical difference" between standards of review for two forms of mandate].) Either way, we review de novo the primarily legal issues of whether (1) Moraga's violation of section 65302(a) precluded it from denying the Bruzzones' application and (2) the trial court properly issued a writ directing Moraga to adopt a compliant land-use designation for the property. (See *Marquez v. State Dept. of Health Care Services* (2015) 240 Cal.App.4th 87, 103; *California Dept. of Corrections v. State Personnel Bd.* (2004) 121 Cal.App.4th 1601, 1611.) Ultimately, we review the town's action, not the trial court's decision. (See *Sequoia Union High School Dist. v. Aurora Charter High School* (2003) 112 Cal.App.4th 185, 195; *McGill v. Regents of University of California* (1996) 44 Cal.App.4th 1776, 1786.)

2. The general plan and land-use element

"To ensure that localities pursue 'an effective planning process' (§ 65030.1), each city and county [in California] must 'adopt a comprehensive, long-term general plan' for its own 'physical development' . . . . (§ 65300.) When adopting general plans, localities must 'confront, evaluate[,] and resolve competing environmental, social[,] and economic interests.' [Citation.] Because of its broad scope, long-range perspective, and primacy over subsidiary land use decisions, the 'general plan has been aptly described as the "constitution for all future developments" within the city or county.' " (*Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 152 (*Orange Citizens*).)

Section 65302 addresses the contents of a locality's general plan, which "shall" include several elements, including a land-use element.[6] (§ 65302;

_____

[6] The Bruzzones filed a request for judicial notice of a publication of the Governor's Office of Planning and Research that provides guidelines for

12

*Orange Citizens*, *supra*, 2 Cal.5th at p. 153.) The land-use element "designates the proposed general distribution and general location and extent of the uses of the land for housing, business, industry, open space, including agriculture, natural resources, recreation, and enjoyment of scenic beauty, education, public buildings and grounds, solid and liquid waste disposal facilities, greenways, . . . and other categories of public and private uses of land. . . . The . . . element shall include a statement of the standards of population density and building intensity recommended for the various districts and other territory covered by the plan." (§ 65302(a).)

" ' "[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements." ' " (*Orange Citizens*, *supra*, 2 Cal.5th at p. 153.) Thus, a general plan is like "a 'yardstick'; one should be able to 'take an individual parcel and check it against the plan and then know which uses would be permissible.' " (*Id.* at p. 159.) A project " ' "is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment." ' " (*Id.* at p. 153.) Although " ' "perfect conformity" ' " between a project and the general plan is not required, the project should " ' "be compatible with the objectives, policies, general land uses[,] and programs specified in the applicable plan." ' " (*San Francisco Tomorrow v. City and County of San Francisco*, *supra*, 229 Cal.App.4th at p. 514.)

---

general plans. We deny the request because the document is unnecessary to our decision.

### 3. Analysis

#### a. *Moraga's procedural defenses fail.*

Initially, Moraga argues that the Bruzzones' challenge to the Study designation is time-barred because the Bruzzones did not raise it when the designation was included in the 2002 general plan. Moraga relies on section 65009, which provides that an action "[t]o attack, review, set aside, void, or annul the decision of a legislative body to adopt or amend a general or specific plan" must be brought "within 90 days after the legislative body's decision." (§ 65009, subd. (c)(1)(A).) This provision "does not apply where an action is brought based upon the complete absence of a general plan or a mandatory element thereof, but does apply to an action attacking a general plan or mandatory element thereof on the basis that it is inadequate." (*Ibid.*)

We agree with the Bruzzones that Moraga forfeited this argument by failing to raise it in the trial court. " '[T]he statute of limitations is a personal privilege which is waived unless asserted at the proper time and in the proper manner, whether it be a general statute of limitations or one relating to a special proceeding.' " (*Chaplin v. State Personnel Bd.* (2020) 54 Cal.App.5th 1104, 1118.) Moraga never argued in the trial court that any aspect of the writ cause of action was time-barred, and it thus failed to preserve the argument. (*Zubarau v. City of Palmdale* (2011) 192 Cal.App.4th 289, 306 [city's section 65009 defense forfeited by failure to raise it in trial court].)

Moraga also claims the Bruzzones "failed to exhaust administrative remedies by not asking [it] to amend the [g]eneral [p]lan, except as a component of their flawed development application." Thus, Moraga argues, not only are the Bruzzones barred from arguing that the illegal designation

14

undermines the town's other decisions involving the project, but the trial court also erred by granting a writ requiring a different designation.

"Generally, 'a party must exhaust administrative remedies before resorting to the courts.  [Citations.]  Under this rule, an administrative remedy is exhausted only upon "termination of all available, nonduplicative administrative review procedures." ' "  (*Plantier v. Ramona Municipal Water Dist.* (2019) 7 Cal.5th 372, 382.)  The exhaustion doctrine "is primarily grounded on policy concerns related to administrative autonomy and judicial efficiency," permitting "an agency to reach a final decision without interference from the courts" while enabling any necessary "judicial review by allowing the agency to draw upon its expertise and develop a factual record for the court's consideration."  (*Id.* at p. 383.)

Section 65009, subdivision (b)(1), which "limits issues that may be raised in a proceeding to attack a public agency's finding or determination to those that were previously raised in a public hearing or in written correspondence delivered to the agency," codifies the exhaustion requirement in the land-use context.  (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 831; § 65009, subd. (b)(1).)  To satisfy the requirement, " 'the exact issue raised in the lawsuit must have been presented to the administrative agency so that it will have had an opportunity to act and render the litigation unnecessary.' [Citations.]  Generalized objections are not sufficient to preserve specific legal and factual issues for judicial review."  (*Harrington v. City of Davis* (2017) 16 Cal.App.5th 420, 441; *Greene v. California Coastal Com.* (2019) 40 Cal.App.5th 1227, 1237.)

Moraga argues that the Bruzzones failed to exhaust based on this principle, because they never asked it "to adopt a land use designation independent of their development application," and they did not claim until

15

this lawsuit was filed "that they lacked sufficient information to have applied for a project approval" without one. In fact, the Bruzzones repeatedly challenged the Study designation during the administrative proceedings. Not only did they argue that it prevented them from developing the property, but they also specifically argued that there was "no legal precedent" for leaving the designation in place for so long and that Moraga had an "obligation" to change it. These and similar statements gave Moraga sufficient notice of the claim the Bruzzones now raise. Accordingly, we reject Moraga's argument that the Bruzzones' challenge to the Study designation is barred.

> b. *The unlawful Study designation did not prevent Moraga from denying the project application for unrelated reasons.*

Having rejected Moraga's procedural defenses to the Bruzzones' writ claim, we turn to the claim's merits. Initially, we agree with the Bruzzones that the Study designation violates section 65302(a). "A general plan is legally adequate if it substantially complies" with the relevant statutory requirements, including section 65302. (*Federation of Hillside & Canyon Assns. v. City of Los Angeles*, *supra*, 126 Cal.App.4th at p. 1195.) " ' "Substantial compliance . . . means *actual* compliance in respect to the substance essential to every reasonable objective of the statute," as distinguished from "mere technical imperfections of form." ' " (*Ibid.*)

Moraga does not contest that the Study designation violates section 65302(a). That provision requires a general plan's land-use element to designate particular "categories of public and private uses of land" and includes a non-exclusive list of examples. (§ 65302(a).) Here, "Study" does not describe a use of land, and there is no dispute that the designation was a placeholder until Moraga could determine the appropriate permanent category. A land-use element must also "include a statement of the

16

standards of population density and building intensity recommended for the various districts and other territory covered by the plan" (§ 65302(a)), and the Study designation does not include such information. Thus, the designation does not substantially comply with the statute. (See *Twain Harte Homeowners Assn. v. County of Tuolumne* (1982) 138 Cal.App.3d 664, 697–699 (*Twain Harte*) [no substantial compliance where general plan failed to identify population and building density for all land-use categories]; *Camp v. Board of Supervisors* (1981) 123 Cal.App.3d 334, 349–350 (*Camp*) [same].)

We conclude, as did the trial court, that Moraga had a mandatory duty to adopt a legally compliant land-use designation for the property. To obtain writ relief under Code of Civil Procedure section 1085, "a party must establish ' "(1) A clear, present[,] and usually ministerial duty on the part of the [agency] . . . ; and (2) a clear, present[,] and beneficial right in the petitioner to the performance of that duty." ' " (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 868.) A duty is ministerial if the agency " ' " 'is required to perform in a prescribed manner in obedience to the mandate of legal authority,' " ' without regard to [its] own judgment or opinion concerning the propriety of such act." (*Ellena v. Department of Ins.* (2014) 230 Cal.App.4th 198, 205.) Although ordinary mandate cannot be used "to force a public entity to exercise discretionary powers in any particular manner, if the entity refuses to act, mandate is available to compel the exercise of those discretionary powers in some way." (*Ibid.*) In other words, although Moraga cannot be compelled to adopt a *particular* land-use designation for the property, it has a duty to adopt one that is *legal*. Thus, as we discuss further below, the trial court properly issued a writ directing Moraga to fulfill this duty.

17

The Bruzzones contend this writ relief is insufficient. According to them, the fact that the Study designation violates section 65302(a) "takes the entire land use element out of compliance, which, in turn, prevents [Moraga] from considering development applications." They insist that the denial of their application "must be set aside" as a matter of law, and Moraga must be directed to reconsider their application once it gives the property a valid land-use designation. We are not persuaded. Although a deficient general plan may render some kinds of subsequent land-use decisions void, the Bruzzones fail to demonstrate that these include the denial of a project application on grounds that do not involve the deficiency.

Of the decisions on which the Bruzzones rely, *Camp* comes closest to supporting their claim. In that case, the Attorney General and residents of Mendocino County brought actions claiming that the county's general plan "was invalid because some of its elements did not meet the requirements of section 65302" and that the county's approval of tentative maps for two subdivisions was therefore illegal. (*Camp*, *supra*, 123 Cal.App.3d at pp. 340, 342–344.) Division Four of this court agreed with the trial court's determination that several of the plan's elements, including the land-use element, did not substantially comply with section 65302. (*Camp*, at pp. 349–352.) *Camp* therefore affirmed the trial court's issuance of writs of mandate requiring the county not only to adopt a valid general plan but also to vacate approval of the tentative maps, "on the ground that the [maps' approvals were] void for lack of a valid general plan without which [they] could not lawfully be taken." (*Id.* at p. 355.)

The only authority *Camp* cited for the proposition that the tentative-map approvals were invalid as a result of the deficient general plan was another Division Four case, *Save El Toro Assn. v. Days* (1977) 74 Cal.App.3d

18

64. (*Camp*, *supra*, 123 Cal.App.3d at pp. 352–353 & fn. 10, 360.) *Save El Toro* held that because a city had "not adopted a valid open space plan[,] the city [could not] take any action to acquire, regulate[,] or restrict open space land or [to] approve a subdivision map." (*Save El Toro*, at p. 74.) But that holding was based on a specific statute providing that " '[n]o building permit may be issued, no subdivision map approved, and no open-space zoning ordinance adopted, unless the proposed construction, subdivision[,] or ordinance is consistent with the local open-space plan.' " (*Ibid.*, quoting § 65567.) Likewise, in *Camp*, other statutes provided that a tentative map could not be approved unless " 'consistent with' " the general plan. (*Camp*, at p. 342 & fn. 3, citing §§ 66473.5, 66474, subd. (a).) Thus, the approvals at issue in *Save El Toro* and *Camp* were invalid because, by statute, they could not issue in the absence of a valid general or open space plan.[7]

Here, in contrast, the Bruzzones identify no law that prohibited Moraga from *denying* the project application just because the general plan's land-use element did not fully comply with section 65302(a). Had the town rejected the application on the ground that the project was inconsistent with the unlawful Study designation, the decision might not stand as an abuse of discretion based on the failure to "proceed[] in the manner required by law." (Code Civ. Proc., § 1094.5, subd. (b); see, e.g., *Orange Citizens*, *supra*,

---

[7] Other types of land-use decisions are also per se invalid if they fail to comply with the general plan. For example, under section 65860, subdivision (a), zoning ordinances must "be consistent with the general plan of the county or city." Thus, "[a] zoning ordinance that conflicts with a general plan is invalid at the time it is passed." (*Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 544; see, e.g., *Sierra Club v. Board of Supervisors* (1981) 126 Cal.App.3d 698, 703–704 [zoning ordinance invalid when passed because inconsistent with general plan's open space element].)

19

2 Cal.5th at pp. 154–155 [city abused its discretion by finding project consistent with general plan based on invalid amendment to plan].) But here, the reasons given for the denial—including public safety concerns and environmental impacts—had nothing to do with the improper designation. If the Bruzzones' position were accepted, it would mean that any deficiency in the general plan would preclude a locality from making any land-use decision until the deficiency was corrected. That is not the law.[8]

Put another way, the Bruzzones have not demonstrated a "prejudicial abuse of discretion" in the denial of the project application. (Code Civ. Proc., § 1094.5, subd. (b); *Levi Family Partnership, L.P. v. City of Los Angeles* (2015) 241 Cal.App.4th 123, 136, fn. 10.) They insist that "[n]othing in [s]ection 65302, or cases interpreting it, . . . requires a petitioner to show it has been 'prejudiced' in using its land," and in any case they have established such prejudice because "[d]uring the 40 years the [p]roperty has been designated 'Study,' no development has been allowed and [they] have been denied any and all use of their property." But the Bruzzones already obtained writ relief requiring Moraga to adopt a legally compliant designation for the property, so the relevant issue on appeal is not whether the Study designation generally caused them prejudice. Rather, to obtain the further relief of overturning the project application's denial based on the unlawful designation, they must show that Moraga's violation of the law

---

[8] Indeed, under section 65755, if a judgment is entered finding a general plan not legally compliant, a locality can continue to make certain land-use decisions while bringing the general plan into compliance. (§ 65755, subds. (a)–(b).) Thus, the governing statutory law explicitly contemplates that even if elements of the general plan are invalid, a locality may still make land-use decisions that are otherwise legal.

unfavorably affected the town's consideration of their application. (See *Levi Family Partnership,* at p. 136, fn. 10.) This they fail to do.

For similar reasons, we also reject the argument that Moraga must consider the project application anew because its failure to adopt a compliant land-use designation required the Bruzzones to seek to amend the Study designation at the same time they submitted the project application. The Bruzzones claim this left them to "guess at what [designation] the [t]own might approve," but they do not explain how they might have obtained a better result had the property had a valid designation to begin with. Again, since Moraga denied the project application for reasons that did not depend on the property's land-use designation, requiring the town to reconsider the application after adopting a legal designation would not change the outcome.

To be sure, we do not countenance a local agency's indefinite delay in adopting a legally compliant land-use designation. Although we need not decide here how long is too long, we agree with the trial court that the decades-long Study designation was improper and warranted writ relief. The Bruzzones fail to demonstrate, however, that they are *also* entitled to overturn Moraga's denial of the project application.

c.      *Moraga's cross-appeal lacks merit.*

In its cross-appeal, Moraga claims the trial court erred by issuing the writ of mandate requiring the town to adopt a valid land-use designation for the property. We are not persuaded.

Moraga claims that the writ of mandate should not have issued because the town "never violated a mandatory duty nor prejudicially abused its discretion." Moraga appears to rely on the notion that it "proceeded as the Bruzzones requested" by retaining the Study designation instead of adopting an open space designation in 2002. As discussed above, however, Moraga

21

violated its mandatory duty to adopt a legally compliant land-use designation for the property, a duty that existed independently of any action or inaction by the Bruzzones.

Moraga also claims that writ relief was inappropriate because the town demonstrated its willingness to adopt a land-use designation for the property without being compelled to do so. The town points to evidence suggesting that it is in the process of replacing the Study designation and rezoning the property.[9] Moraga argues that "[u]nless 'it is clear that public officers do not intend to comply with their obligation when the time for performance arrives,' . . . a court may not issue a writ of mandate 'to compel [the] performance of future acts.' " (Quoting *Knoll v. Davidson* (1974) 12 Cal.3d 335, 343, fn. 6.) But the "future acts" *Knoll* referred to are those taken to fulfill duties that have not yet arisen, not future acts to comply with duties that already exist. Under the plain terms of Code of Civil Procedure section 1085, "a writ of mandate may be issued by any court . . . to *compel the performance of an act* which the law specially enjoins," necessarily referring to an act that will occur after the writ issues. (Code Civ. Proc., § 1085, subd. (a), italics added.) Moraga has a present duty to adopt a legal land-use designation for the property, which it violated for several decades, and the trial court was hardly required to accept its assurance that it now intended to comply with that duty without the need to issue a writ. In short, Moraga's cross-appeal fails.

---

[9] We grant Moraga's unopposed request for judicial notice of a staff report and the minutes from a February 2022 town council meeting showing discussion of the property's rezoning. At oral argument, Moraga's counsel represented that in June 2023, the property received a land-use designation of rural residential, permitting up to one dwelling unit per five acres.

B.	*The Trial Court Correctly Ruled that Moraga's Actions Did Not Constitute a Regulatory Taking.*

The Bruzzones claim that the trial court erred by rejecting their takings claim. We are not persuaded.

### 1.	Additional facts

In their cause of action for inverse condemnation, the Bruzzones alleged that the Study designation and Moraga's refusal to approve the project or any alternatives amounted to a temporary or permanent taking of the property. The trial court determined that the claim was ripe only as to the Study designation and the denial of a project of 85 homes or more.

The trial court then concluded that "the failure to zone the property was not a temporary taking," because it did not deprive the Bruzzones of all economically beneficial use of the property or otherwise constitute a regulatory taking under *Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104 (*Penn Central*). Applying the same legal standards, the court also concluded that "the disapproval of the 85-lot proposal" was not a permanent regulatory taking.

### 2.	General legal standards

Under the federal and state Constitutions, private property cannot be "taken" for public use without the payment of "just compensation." (U.S. Const., 5th amend.; Cal. Const., art. I, § 19, subd. (a).)[10] "The Fifth Amendment's takings clause, made applicable to the states through the Fourteenth Amendment, does not prohibit the taking of private property. Rather, it places a condition—payment of just compensation—on the exercise

---

[10] The federal and California constitutional provisions are construed "congruently," except with regard to a difference in scope that is not relevant here. (*San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 664.)

of that power." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 259; *Lingle v. Chevron U.S.A. Inc.* (2005) 544 U.S. 528, 536–537 (*Lingle*).) "This constitutional guarantee is ' "designed to bar [g]overnment from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." ' " (*Jefferson Street Ventures, LLC v. City of Indio* (2015) 236 Cal.App.4th 1175, 1192 (*Jefferson Street*), quoting *Penn Central*, *supra*, 438 U.S. at p. 123.)

At issue here is a regulatory taking, as opposed to "a direct government appropriation or physical invasion of private property." (*Lingle*, *supra*, 544 U.S. at p. 537.) Sometimes, "government regulation of private property may . . . be so onerous that its effect is tantamount to a direct appropriation or ouster." (*Ibid.*) Such a taking is per se compensable if the government action "completely deprive[s] an owner of '*all* economically beneficial us[e]' of [the] property." (*Id.* at p. 538.) Even if not per se compensable, a regulatory taking may be established when the government action "go[es] 'too far' . . . [and] substantially interferes with the ability of a property owner to make economically viable use of, derive income from, or satisfy reasonable, investment-backed profit expectations with respect to the property." (*Jefferson Street*, *supra*, 236 Cal.App.4th at pp. 1193–1194.)

A regulatory taking that is not per se compensable "is evaluated under a set of standards first articulated by the [United States] Supreme Court in *Penn Central*, *supra*, 438 U.S. 104." (*Lockaway Storage v. County of Alameda* (2013) 216 Cal.App.4th 161, 184 (*Lockaway Storage*); *Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 775 (*Kavanau*).) *Penn Central* requires "an ad hoc factual inquiry" focusing on "three primary factors: (1) the 'economic impact' of the regulation on the claimant, (2) the extent to which the regulation interfered with 'distinct, investment-backed

24

expectations,' and (3) the 'character of the government action.' " (*Lockaway Storage*, at p. 185; *Kavanau*, at p. 775.) "Although the *Penn Central* factors do not serve as a checklist, a court may dispose of a takings claim on the basis of one or two of them." (*Shaw v. County of Santa Cruz, supra*, 170 Cal.App.4th at p. 272.)

A property owner may bring a cause of action for inverse condemnation to recover damages resulting from an unlawful taking. (*First English Evangelical Lutheran Church v. County of Los Angeles* (1987) 482 U.S. 304, 315; *Baker v. Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862, 867 & fn. 4.) Takings may be either permanent or temporary. "Once the government's actions have worked a taking of property, 'no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective.' " (*Arkansas Game & Fish Commission v. United States* (2012) 568 U.S. 23, 33.) "Thus, if a property owner prevails in an inverse condemnation action, and the regulatory agency elects to withdraw the regulation that effected the taking, the property owner may have a right to just compensation for the period that the regulation was in effect." (*Lockaway Storage, supra*, 216 Cal.App.4th at p. 184.)

Whether governmental action constituted a taking is a mixed question of law and fact. (*Lockaway Storage, supra*, 216 Cal.App.4th at p. 183.) " ' "Mixed questions of law and fact involve three steps: (1) the determination of the historical facts—what happened; (2) selection of the applicable legal principles; and (3) application of those legal principles to the facts." ' " (*Ibid.*) At the first step, we review the trial court's resolution of factual questions for substantial evidence. (*Ibid.*) The other two steps involve questions of law that we review de novo. (*Ibid.*)

3.    We decline to disturb the trial court's ripeness ruling.

As we have said, the trial court determined that the takings claim was ripe as to the denial of a project of 85 homes or more and the Study designation itself, but not as to smaller potential projects. On appeal, the Bruzzones argue that the whole takings claim is ripe, while Moraga argues that the whole claim is unripe. As we now explain, neither party attempts to demonstrate why the court erred in its more nuanced determination. Therefore, both parties' arguments are forfeited.[11] (See *Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609 [judgment is presumed correct, and party challenging ruling has burden to show that trial court erred].)

A regulatory takings claim " ' "is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue," ' i.e., when 'there has been a "final, definitive position regarding" how the regulations will be applied to the land.' " (*Felkay v. City of Santa Barbara, supra*, 62 Cal.App.5th at p. 39.) Thus, "a landowner must have made at least one development proposal that has been thoroughly rejected by land[-]use authorities and have prosecuted at least one meaningful application for a

---

[11] Moraga also argues that the takings claim is not ripe because the Bruzzones failed to obtain "a writ of mandate commanding the Town to rescind its denial [of the project], reconsider the application, and/or take a different action." The argument goes not to ripeness but to judicial exhaustion, which requires a property owner to seek writ review of an alleged regulatory taking before obtaining compensation for it. (See *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 13–14; *Felkay v. City of Santa Barbara* (2021) 62 Cal.App.5th 30, 41.) This requirement may be fulfilled by jointly bringing a writ petition and an action for inverse condemnation, as the Bruzzones did. (*Hensler*, at p. 14.) Although a local entity must have the opportunity to rescind the action before it has to pay compensation for a permanent taking (*ibid.*), here the trial court correctly rejected the takings claim on the merits, making Moraga's point moot.

zoning variance, which has been finally denied." (*County of Alameda v. Superior Court* (2005) 133 Cal.App.4th 558, 567–568.) This finality requirement ensures that a court can make " 'the constitutional determination whether a regulation has deprived a landowner of "all economically beneficial use" of the property, [citation], or defeated the reasonable investment-backed expectations of the landowner to the extent that a taking has occurred.' [Citation.] Simply put, a court cannot say whether a regulation goes too far in restricting the use of property unless it knows how far the regulation goes." (*Id.* at p. 567.)

The Bruzzones barely mention ripeness in their opening brief. They state that the trial court's ripeness "analysis was ambiguous as to smaller proposals," suggesting they believe the trial court did *not* rule that the takings claim was unripe as to projects under 85 homes. We disagree with this assessment. After reviewing the evidence to decide "whether [Moraga] made a decision about development smaller than 85[] lots," the court answered in the negative: "[T]he record shows that [Moraga] did not reject all possible development on the property. [The Bruzzones] failed to specifically request that [Moraga] consider the smaller options and thus, the [c]ourt cannot use [Moraga's] failure to approve or reject the smaller alternatives as a sign that [it] would not approve one of the smaller alternatives." Although acknowledging that some of Moraga's grounds for disapproving the project would "apply to any proposal, even of much less density," the court explained in detail why it nevertheless concluded the town did not finally reject developments smaller than 85 homes.

The Bruzzones do not explain why the trial court's reasoning was unsound, and they therefore forfeited any argument that the takings claim was ripe as to smaller projects. In particular, they do not argue that

27

insufficient evidence supports the factual finding that Moraga did not decisively reject the proposals for developments smaller than 85 homes. Thus, although the Bruzzones repeatedly claim that Moraga rejected *all* project alternatives, including the 8-home and 37-home proposals, we defer to the court's finding that the town rejected only projects of 85 homes or more.

For its part, Moraga broadly contends the takings claim is unripe, but it likewise fails to challenge the trial court's ripeness determination. The town argues that the "Bruzzones have conceded that they lack a ripe takings claim" because they have failed to carry their "continu[ing] . . . burden [on appeal] to prove ripeness." We reject the suggestion that the Bruzzones are required to establish ripeness anew, even though the trial court already ruled partially in their favor on the issue. Rather, if Moraga disagreed with that aspect of the court's ruling, it had the burden of showing error, which it has failed to do. Although the town spends a dozen pages of briefing addressing the ripeness issue, it never directly asserts that the ruling was erroneous. Therefore, we decline to disturb the court's determination that the takings claim was ripe as to the Study designation and projects of 85 homes or more.

4. The takings claim fails on the merits.

The Bruzzones claim that a taking is established "given Moraga's 40-year stranglehold on the [p]roperty through the application of the invalid Study designation and [the town's] more recent rejection of [their] attempt to get a valid designation approved." We are not persuaded.

We first dispose of the Bruzzones' argument that "Moraga's enactment of the Study designation prohibiting development, and its continuing decision to confine the [p]roperty to Study for 43 years and counting, are so egregious as to qualify as a taking of 'all economically beneficial use' " of the property, establishing a per se regulatory taking. Only government actions "that

28

completely deprive an owner of '*all* economically beneficial us[e]' of [the] property," a "relatively narrow categor[y]," are per se takings. (*Lingle*, *supra*, 544 U.S. at p. 538.)

We agree with the trial court that the Study designation did not prevent the Bruzzones from seeking to develop the property. Although they had to submit a proposed general plan amendment with the project application, the application was not denied because of the Study designation. Nor did Moraga's refusal to approve a project of 85 or more homes—the only aspect of the application denial that is ripe—deprive the Bruzzones of all economically beneficial use of the property, and they do not argue otherwise on appeal. Thus, even setting aside the property's actual use for grazing and an equestrian camp, there was no per se taking because the Bruzzones failed to show that smaller projects would not be "economically beneficial uses."

The Bruzzones also claim that Moraga engaged in a regulatory taking under *Penn Central*. The first *Penn Central* factor is the regulation's "economic impact" on the plaintiff. (*Lockaway Storage*, *supra*, 216 Cal.App.4th at p. 185.) "[T]ypically the [economic] harm is measured by the difference between the fair market value of the property as subject to the regulatory restraint, and its value without it." (*640 Tenth LP v. Newsom* (2022) 78 Cal.App.5th 840, 861.)

The Bruzzones claim this factor is met because Moraga rejected "the entire range" of possible projects and their "economic loss is total." But in ruling on ripeness, the trial court specifically found that the town had *not* decisively ruled out projects smaller than 85 homes, and we have already explained why the Study designation did not preclude the Bruzzones from pursuing any development. The court also concluded there was insufficient evidence that an 85-home project was "the smallest development that is

29

economically feasible." The Bruzzones cursorily challenge this ruling, but they fail to explain why the evidence they presented compelled a different finding. (See *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465–466 [party challenging factual findings who had burden of proof below must show " 'evidence compels a finding in [its] favor . . . as a matter of law' "].)

The second *Penn Central* factor is the extent to which the regulation interfered with the plaintiff's " 'distinct, investment-backed expectations.' " (*Lockaway Storage*, *supra*, 216 Cal.App.4th at p. 184.) The Bruzzones claim that this factor is met because the property's designation when they bought it would have allowed "up to 540 homes," but Moraga "rejected [a]lternatives for as few as eight homes[,] . . . a density less than 1.5% of [their] investment-backed expectations." Although the trial court found that the Bruzzones "had an investment-backed expectation that they would be permitted to build multiple units," it also found that they did not have a reasonable expectation of building 540 homes. Not only was it "unclear what kind of development the [t]own would have permitted in the 1970[']s," but "[t]he character of the land . . . might have limited . . . the actual [number] of houses that could be built." Again, the Bruzzones fail to demonstrate that these findings were erroneous.

The Bruzzones also argue as to this factor that the Study designation thwarted "*any* economically feasible development." As explained above, however, the trial court properly found that Moraga's "failure to designate a land use in the [general] plan . . . did not prevent [the Bruzzones] from attempting to develop [the property]." Moreover, the court explained in detail why it concluded that the Study designation worked no more than "a slight interference with the investment-backed expectations," citing among other

30

things the lack of evidence that the Bruzzones pursued development in the 1980's and 1990's and the lack of evidence of the property's "current value based on the current restrictions." The Bruzzones do not meaningfully challenge these factual determinations.

Finally, the third *Penn Central* factor considers the " 'character of the government action.' " (*Lockaway Storage*, *supra*, 216 Cal.App.4th at p. 184.) This goes to whether the government action is more akin to a classic physical taking or is "a 'mere' consequence of a public program" in support of the common good. (*Id.* at p. 186.) The Bruzzones suggest this factor supports a taking because Moraga's actions allowed them "no reasonable use" of the property. Again, this is a false premise, as they have failed to show either that smaller projects are economically infeasible or that they were unable to develop or use the property at all while the Study designation was in place. In any case, the trial court acknowledged that Moraga's actions imposed some burden on the Bruzzones under this factor, but it concluded that on balance no taking was established under *Penn Central*. The Bruzzones provide no convincing reason to disturb this assessment, and we therefore conclude the court properly rejected the takings claim.[12]

C. *Moraga's Actions Did Not Violate the Bruzzones' Rights to Equal Protection or Substantive Due Process.*

The Bruzzones contend that the trial court erred by rejecting their claims that Moraga's actions denied them equal protection and substantive due process. We are not persuaded.

---

[12] The Bruzzones also argue that *Kavanau*, *supra*, 16 Cal.4th at pp. 775–776, which set forth factors other than the primary three under *Penn Central*, "[c]onfirm[s]" that Moraga's actions constitute a taking. (Boldface omitted.) We reject this argument, which mostly repeats the points the Bruzzones make under *Penn Central*.

31

The operative complaint alleged a cause of action under 42 United States Code section 1983 for violation of the Bruzzones' rights to equal protection and due process. The Bruzzones alleged that Moraga's denial of the project application and failure to apply a proper land-use designation violated their right to equal protection because they were treated "differently from other similarly situated property owners." The Bruzzones also alleged that these actions constituted "an arbitrary and irrational exercise of power without any reasonable justification in the service of a legitimate governmental objective," in violation of their substantive due process rights.

The trial court rejected both aspects of this cause of action. The court observed that "the record amply shows why [the] property is different from others within [Moraga]," including because of its remoteness. Thus, the court concluded that the Bruzzones' equal protection claim failed because there was a rational basis for the town's actions. For similar reasons, the court also concluded that the Bruzzones failed to demonstrate the town's actions were irrational or arbitrary in violation of their rights to substantive due process.

Before turning to the merits, we reject Moraga's contention that these two claims are not ripe because the Bruzzones' takings claim is not ripe. In light of our affirmance of the trial court's ruling on the ripeness of the takings claim, we conclude that the equal protection and substantive due process claims are ripe as to the Study designation and the denial of a project of 85 homes or more. (See *Smith v. City and County of San Francisco* (1990) 225 Cal.App.3d 38, 54 [same ripeness standards that apply to takings claims apply to other constitutional challenges to land-use decisions].)

1.      Equal protection

"The federal equal protection clause (U.S. Const., 14th Amend.) and its California counterpart (Cal. Const., art. I, § 7, subd. (a)) provide that persons

32

who are similarly situated with respect to the legitimate purpose of a law must be treated alike under the law." (*Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 857 (*Las Lomas*).) Although "[e]qual protection challenges typically involve claims of discrimination against an identifiable class or group of persons[,] . . . a plaintiff who does not allege membership in a class or group may state a claim as a ' "class of one." ' " (*Ibid.*, quoting *Village of Willowbrook v. Olech* (2000) 528 U.S. 562, 564.) A "class of one" claim requires a showing that "(1) the plaintiff was treated differently from other similarly situated persons, (2) the difference in treatment was intentional, and (3) there was no rational basis for the difference in treatment." (*Las Lomas*, at p. 858.)

As noted above, the trial court concluded that in light of the property's unique aspects, Moraga had a rational basis for the Study designation and the denial of projects of 85 homes or more. "The rational basis test is extremely deferential and does not allow inquiry into the wisdom of government action." (*Las Lomas*, *supra*, 177 Cal.App.4th at p. 858.) Under this test, "courts must presume the constitutionality of government action if it is plausible that there were legitimate reasons for the action. In other words, the plaintiff must show that the difference in treatment was ' "so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [government's] actions were irrational." ' " (*Id.* at p. 859.) We review de novo whether there was a rational basis for governmental action. (*California Grocers Assn. v. City of Los Angeles* (2011) 52 Cal.4th 177, 208–209.)

We begin with Moraga's action of keeping the Study designation in place. The Bruzzones do not clearly explain why this action was irrational, focusing instead on the fact that they were treated differently than other

33

property owners. In their reply brief, they suggest that the action did not "further legitimate ends since the 'Study' designation fails to comply with the requirements of [s]ection 65302(a)." The mere fact an action may be invalidated on some other ground, however, fails to establish that the action had no conceivable rational basis.

Relying on two decisions by the Ninth Circuit Court of Appeals, the Bruzzones also claim that "[a] city may not arbitrarily limit use and development of a property, e.g., . . . set it aside as an open space for public use," while "owners of comparable property [are] not subjected to the same restrictions." One of those decisions did not analyze the plaintiffs' equal protection claim in any depth, concluding only that the jury's finding of liability was not plain error. (*Herrington v. County of Sonoma* (9th Cir. 1987) 834 F.2d 1488, 1501, amended by 857 F.2d 567.) Thus, it does not aid the Bruzzones' argument.

The other decision the Bruzzones cite, *Del Monte Dunes v. Monterey* (9th Cir. 1990) 920 F.2d 1496, does not support their position either. In that case, the plaintiffs alleged that the City of Monterey "arbitrarily and unreasonably limited use and development of [their] property and set aside open space for public use, whereas owners of comparable property along the Monterey Bay were not subjected to these conditions and restrictions," and the plaintiffs "were singled out to bear the burden of the City's attempt to bring back the Smith's Blue Butterfly by creating a 'butterfly park' on the majority of [their] land." (*Id.* at pp. 1508–1509.) The Ninth Circuit reversed the district court's dismissal of the claim, concluding that "[a]lthough the objective of preserving a habitat for the Smith's Blue Butterfly [was] rational, it may not be rational to single out this parcel to provide it," and "[g]enuine issues of material fact remain[ed] to be determined." (*Id.* at p. 1509.)

34

The Bruzzones fail to demonstrate that the Study designation is analogous to the land-use decision in *Del Monte Dunes v. Monterey*, *supra*, 920 F.2d 1496. There, the locality withdrew its approval of a project, in part on the basis that the plaintiffs did not comply with conditions related to the butterfly habitat. (*Id*. at pp. 1502–1506.) Here, Moraga merely delayed adopting a permanent land-use designation to gather more information about the property, which was rational in light of the property's unique aspects. Despite the Bruzzones' protestations to the contrary, the Study designation did not "mak[e] it impossible to use the [p]roperty" or prevent them from submitting a project application. Rather, the Bruzzones were able to propose a permanent designation in conjunction with the project, allowing them to present their vision for the property without restriction. Indeed, in 2002 the Bruzzones made clear that they opposed a permanent designation that would have prevented them from pursuing large-scale development. Thus, although Moraga's action ultimately resulted in an unreasonably long delay in complying with section 65302, we cannot say it lacked any rational basis.

The Bruzzones likewise fail to demonstrate that Moraga had no rational basis for denying the project application. They assert that the town "treat[ed] [them] in an unequal manner without a rational basis—other than to take private property for a public use without just compensation," but they cite no facts other than those involving the Study designation. Indeed, they do not even attempt to explain why the reasons Moraga actually gave for denying the application, much less any conceivable reasons the town could have had, were irrational. (See *Las Lomas*, *supra*, 177 Cal.App.4th at p. 859.) As is true of many land-use decisions, the decision whether to approve the project "involve[d] numerous public policy considerations and the exercise of discretion based on a subjective, individualized determination,"

35

making it essentially impossible to show the project's denial was irrational. (*Id.* at p. 860; *Engquist v. Oregon Department of Agriculture* (2008) 553 U.S. 591, 603.)  The Bruzzones have not met that burden here.

### 2. Substantive due process

"The state and federal Constitutions prohibit government from depriving a person of property without due process of law.  (Cal. Const., art. I, §§ 7, 15; U.S. Const., 14th Amend., § 1.)" (*Kavanau, supra*, 16 Cal.4th at p. 771.)  The substantive aspect of this guarantee "protects against arbitrary government action." (*Las Lomas, supra*, 177 Cal.App.4th at p. 855.)  A substantive due process violation requires "some form of outrageous or egregious conduct constituting 'a true abuse of power,' " not just " 'ordinary government error.' " (*Id.* at pp. 855–856, quoting *Galland v. City of Clovis* (2001) 24 Cal.4th 1003, 1032.)

The Bruzzones argue that they "have a protected property right in . . . a . . . [land-use] designation that complies with [s]ection 65302," and Moraga's failure give the property such a designation for over 40 years " 'shocks the conscience.' "  But "[t]ypical land use disputes involving alleged procedural irregularities, violations of state law, and unfairness ordinarily do not implicate substantive due process." (*Las Lomas, supra*, 177 Cal.App.4th at p. 856.)  Here, although Moraga violated section 65302 by not giving the property a compliant land-use designation, there were rational reasons to retain the Study designation, including the Bruzzones' request to that effect.  Moreover, the Study designation did not prevent the Bruzzones from seeking to develop the property or otherwise substantially hinder its use.  Thus, they fail to demonstrate that Moraga's action was so outrageous that it denied them substantive due process.  (See *Las Lomas*, at p. 856.)

36

*D.    The Claim for Declaratory Relief Fails Since the Bruzzones' Other Claims Do.*

The Bruzzones also claim that the trial court erred by denying them declaratory relief, which they sought on the basis that Moraga violated the law as described in their other causes of action.  Since we reject their claims that "the Study designation violated [s]ection 65302 as a matter of law," invalidating the general plan's land-use element; "constitutes a temporary/permanent taking for which compensation is owed[;] and is a violation of [their] equal protection and substantive due process rights," we also conclude that declaratory relief was properly denied.

*E.    The Trial Court Did Not Abuse Its Discretion by Denying Costs to the Bruzzones.*

The Bruzzones argue that the trial court erred by denying them costs on the basis they were not the prevailing party.  They also argue that the costs they sought for preparing the administrative record were reasonable and necessary.  We conclude the court did not err by determining they were not entitled to costs, and thus we need not address their second argument.

1.    Additional facts

The Bruzzones requested $94,687.25 in costs, of which $91,880.16 was for "[a]dministrative record preparation costs and messenger fees" and the remaining amount was for filing, motion, and court reporter fees.  Moraga moved to strike these costs on the basis that the Bruzzones were not the prevailing party on any cause of action, including the writ claim. Alternatively, Moraga asked the trial court to tax the costs to prepare the administrative record, claiming the administrative record was unnecessary to the portion of the writ claim on which the Bruzzones prevailed and the amount expended was unreasonable.

37

The trial court granted Moraga's motion to strike and tax costs. The court concluded that although the Bruzzones obtained some writ relief, their "goal in the litigation was to get their development proposal approved, not simply to achieve a [g]eneral [p]lan land use designation. The land use designation was simply one of a number of possible roadblocks to approval of a development. It is not clear that compliance with the writ will result in approval of a development proposal for the property." Thus, the court concluded, the Bruzzones "did not, in an overall sense, prevail in this action."

2.     Analysis

Under Code of Civil Procedure section 1032, "[e]xcept as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." (Code Civ. Proc., § 1032, subd. (b).) The statute defines the term "prevailing party" to "include[] the party with a net monetary recovery, a defendant in whose favor a dismissal is entered, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs who do not recover any relief against that defendant. If any party recovers other than monetary relief and in situations other than as specified, the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not and, if allowed, may apportion costs between the parties on the same or adverse sides." (*Id.*, § 1032, subd. (a)(4).)

By obtaining partial writ relief, the Bruzzones "recover[ed] other than monetary relief and in situations other than as specified," meaning the second sentence of Code of Civil Procedure section 1032, subdivision (a)(4), applies. "This portion of the statute does not require the trial court to award costs to the prevailing party 'as a matter of right.' " (*Texas Commerce Bank v. Garamendi* (1994) 28 Cal.App.4th 1234, 1249, quoting Code Civ. Proc.,

38

§ 1032, subd. (b).) Rather, "[i]f a party recovers anything other than monetary relief . . . , a trial court shall determine the prevailing party and use its discretion to determine the amount and allocation of costs, if any." (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1333.) In other words, Code of Civil Procedure section 1032, subdivision (a)(4)'s second "prong . . . ' "calls for the trial court to exercise its discretion *both* in determining the prevailing party *and* in allowing, denying, or apportioning costs." ' " (*Friends of Spring Street v. Nevada City* (2019) 33 Cal.App.5th 1092, 1104 (*Friends of Spring Street*), italics added.)

A party qualifies as the prevailing party under the second prong of Code of Civil Procedure section 1032, subdivision (a)(4), if "the action yielded the primary relief sought." (*Friends of Spring Street*, *supra*, 33 Cal.App.5th at p. 1105.) The Bruzzones argue that under *Friends of Spring Street*, the trial court abused its discretion by concluding they were not a prevailing party, because they "realized their primary litigation objective—to compel Moraga to finally amend its [g]eneral [p]lan to remove the Study designation from the [p]roperty and adopt a legally[]valid designation that prescribes allowed uses and intensity of uses."

In *Friends of Spring Street*, the Third District Court of Appeal reversed the trial court's determination that the plaintiff was not a prevailing party under the second prong of Code of Civil Procedure section 1032, subdivision (a)(4). (*Friends of Spring Street*, *supra*, 33 Cal.App.5th at pp. 1104–1105.) The plaintiff prevailed on its petition for a writ of mandate to stop a bed and breakfast from operating but not on its associated causes of action seeking declaratory and injunctive relief. (*Id.* at pp. 1096, 1102.) The trial court determined that the plaintiff "was not the prevailing party because [it] did not achieve a 'practical result,' it only obtained relief on one of its five

39

causes of action, and [in a prior appeal the appellate court] ordered the parties to bear their own costs on appeal." (*Id.* at p. 1104.) The Third District held that the lower court's reasoning was unsupported, because a plaintiff's " 'failure to succeed on all but one of several "shotgun" causes of action has been held insufficient to deny a party fees and costs,' " and the plaintiff "realized its primary litigation objective [citation], as shown in the 'pleadings, briefs, and other such sources.' " (*Id.* at pp. 1104–1105.)

Here, the trial court did not abuse its discretion under *Friends of Spring Street*. It did not base its denial of costs on the Bruzzones' failure to succeed on more causes of action. Rather, after recognizing that the Bruzzones did obtain writ relief, the court applied the appropriate legal standard to ask whether they achieved their main litigation objective. (See *Friends of Spring Street*, *supra*, 33 Cal.App.5th at pp. 1104–1105.) And its determination that they did not, because their primary objective "was to get their development proposal approved," is supported by the record. There is ample evidence that the Bruzzones wanted to develop the property at a profitable density, not merely to obtain *some* land-use designation for the property.

In resisting this conclusion, the Bruzzones claim that their goal was not "to get their development proposal approved" as the trial court stated, because "[n]othing in the pleadings requested" that relief, and the court could not "have even issued a writ directing such a result." The court's point, however, was that the Bruzzones' focus was on getting *some* project approved, not on obtaining a land-use designation for its own sake. That conclusion is supported by their papers below and in this appeal: Even though they obtained writ relief requiring a new designation, they continue to seek to vacate the denial of their project application and require Moraga to

40

reconsider it.  In short, the court did not abuse its discretion by determining that the Bruzzones did not achieve their primary litigation objective.

> F.    *No Error Appears in the Order Denying the Bruzzones Their Attorney Fees.*

Finally, the Bruzzones claim the trial court improperly denied them attorney fees under Code of Civil Procedure section 1021.5, which authorizes an award of attorney fees to a party who enforces "an important right affecting the public interest."  They also challenge the court's denial of attorney fees under section 800, which authorizes an award of up to $7,500 to a party who obtains relief based on the "arbitrary or capricious action or conduct by a public entity or an officer thereof."  (§ 800, subd. (a).)  We reject these claims.

The Bruzzones sought attorney fees of $720,062 under Code of Civil Procedure section 1021.5 and $7,500 under section 800.  Moraga opposed, and the trial court denied the motion.  As to the Code of Civil Procedure section 1021.5 request, the court concluded that while the Bruzzones achieved some success, the writ they obtained enforced an important right affecting the public interest, and the writ benefited the general public, they failed to meet the statutory requirement that attorney fees be appropriate based on "the necessity and financial burden of private enforcement."  (Code Civ. Proc., § 1021.5.)  The court reasoned that the Bruzzones "had a pecuniary interest in pursuing the action as a whole," rejecting their argument that it was decisive that they "receive[d] no direct benefit from the writ as issued."  As to the section 800 request, the court concluded that the statute did not apply and in any case, Moraga's failure to adopt a permanent land-use designation was not arbitrary or capricious.

41

### 1. Code of Civil Procedure section 1021.5

Code of Civil Procedure "[s]ection 1021.5, 'a codification of the "private attorney general" doctrine, recognizes that "privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible." ' " (*McCormick v. Public Employees' Retirement System* (2023) 90 Cal.App.5th 996, 1003.) The statute permits a court to "award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." (Code Civ. Proc., § 1021.5.) As the party seeking attorney fees, the Bruzzones bear the burden to show they meet the statute's requirements. (*McCormick*, at p. 1004.)

The only statutory requirement the trial court found unsatisfied is that the necessity and financial burden of private enforcement of the right makes attorney fees appropriate.[13] There is no dispute that private enforcement was necessary here, as the litigation " 'proceeded against the only governmental agencies that bear responsibility' " for land-use

---

[13] Moraga argues that contrary to the trial court's determination, none of Code of Civil Procedure section 1021.5's requirements were met. Since we agree with the trial court that the financial burden requirement was not met, we need not address whether the court was correct that the other requirements were met.

determinations, and "the public rights in question were [not] adequately vindicated by [any] governmental action." (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1215 (*Whitley*).) Thus, the sole question we must resolve is whether the court erred by determining that the financial burden of private enforcement did not warrant attorney fees. (See *id.* at p. 1214.) We review that determination for an abuse of discretion, which is established if "there is no substantial evidence to support the required findings." (*Millview County Water Dist. v. State Water Resources Control Bd.* (2016) 4 Cal.App.5th 759, 769 (*Millview*).)

"In determining the financial burden on litigants, courts have quite logically focused not only on the costs of the litigation but also any offsetting financial benefits that the litigation yields or reasonably could have been expected to yield. ' "An award on the 'private attorney general' theory is appropriate when the cost of the . . . legal victory transcends [the plaintiff's] personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to [the plaintiff's] individual stake in the matter.' " ' " (*Whitley, supra,* 50 Cal.4th at p. 1215.) The appropriate focus is on "*financial* incentives and burdens," and "a strong nonfinancial motivation does not change or alleviate the 'financial burden' that a litigant bears." (*Id.* at p. 1217.)

The Bruzzones claim that even though they had a clear "personal interest" in the litigation's outcome, the correct focus is on "the financial or pecuniary gain *actually achieved* by the plaintiff." They argue that attorney fees are therefore appropriate, because they did not obtain monetary relief and the "prospects of reaping any gain or profit remain[] speculative." But a court must determine " 'the estimated value of the case at the time the vital litigation decisions were being made,' " and the plaintiff's eventual pecuniary

43

gain from the lawsuit is relevant to, but not determinative of, this issue. (*Whitley*, *supra*, 50 Cal.4th at p. 1215; *Millview*, *supra*, 4 Cal.App.5th at p. 769.)

Indeed, in *Millview*, this division specifically rejected the argument that a plaintiff's failure to seek or obtain a monetary award establishes that " 'there were "insufficient financial incentives to justify the litigation in economic terms." ' " (*Millview*, *supra*, 4 Cal.App.5th at p. 771.) We explained why the contrary analysis in *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, the primary decision on which the Bruzzones rely, is not binding. (*Millview*, at p. 772.) We stated, "To the extent the court in *Los Angeles Police* intended to suggest that the financial burden analysis is concerned only with the *actual* financial recovery of a party from the litigation, . . . we decline to follow it." (*Ibid.*) The Bruzzones offer no reason to change our stance.

Here, the trial court properly focused on the Bruzzones' "pecuniary interest in pursuing the action as a whole," and it concluded that they "clearly had a substantial financial stake in the outcome of the litigation, one more than sufficient to justify bringing the case, based on the potential value of development, and the damages requested under the 'taking' theory." In challenging this conclusion, the Bruzzones argue that they "could not predict with any certainty that they would prevail," and they emphasize that they still do not know whether they will ever benefit economically from this litigation. Although the probability of success may warrant discounting the litigation's estimated value (see *Whitley*, *supra*, 50 Cal.4th at p. 1216), the fact that monetary gain is not guaranteed does not make a plaintiff's financial incentive "speculative." Ultimately, the Bruzzones fail to show that

the court abused its discretion by finding that their clear financial incentives to bring this case outweighed the burden of litigating it.

2.     Section 800

Section 800, subdivision (a), provides, "In any civil action to appeal or review the award, finding, or other determination of any administrative proceeding under this code or under any other provision of state law, . . . if it is shown that the award, finding, or other determination of the proceeding was the result of arbitrary or capricious action or conduct by a public entity or an officer thereof in [the officer's] official capacity, the complainant if [it] prevails in the civil action may collect from the public entity reasonable attorney's fees . . . not to exceed . . . $7,500 . . . if [the complainant] is personally obligated to pay the fees in addition to any other relief granted or other costs awarded."

An award under section 800 is authorized " ' "only if the actions of a public entity or official were wholly arbitrary or capricious.  The phrase 'arbitrary or capricious' encompasses conduct not supported by a fair or substantial reason, a stubborn insistence on following unauthorized conduct, or a bad faith legal dispute." [Citations.]  Attorney's fees may not be awarded simply because the administrative entity or official's action was erroneous, even if it was "clearly erroneous." ' " (*American President Lines, Ltd. v. Zolin* (1995) 38 Cal.App.4th 910, 934.)  We review the trial court's conclusion that an action was not arbitrary or capricious for an abuse of discretion.  (See *ibid.*)

Moraga argues that the trial court correctly concluded that section 800 does not apply here, because it " 'appl[ies] only to decisions of administrative law judges, or where the party has been denied the right to an administrative hearing.' " (See *Kistler v. Redwoods Community College Dist.* (1993)

45

15 Cal.App.4th 1326, 1336.) Although section 800's scope is somewhat unsettled (see *Gustafson v. Zolin* (1997) 57 Cal.App.4th 1361, 1366–1367), the Bruzzones do not challenge the court's ruling that the statute is inapplicable. Thus, we may affirm the denial of fees under section 800 on this basis alone.

In any case, the Bruzzones fail to show that the trial court erred by concluding that Moraga's actions were not arbitrary or capricious. They assert that "Moraga's actions were far more than an abuse of discretion" because the town "ha[d] no legitimate reason for not complying with [s]ection 65302 . . . for over 40 years," but they do not cite any legal authority to support their claim. Thus, although Moraga's ongoing failure to adopt a proper land-use designation was unlawful, we must affirm the court's determination that it was not arbitrary or capricious.

## III.
### DISPOSITION

The writ of mandate, the judgment, and the orders denying the Bruzzones their costs and attorney fees are affirmed. Moraga is awarded costs on appeal. (See Cal. Rules of Court, rule 8.278(a)(2)–(3), (5).)

_____

Humes, P.J.


WE CONCUR:



_____

Margulies, J.




_____

Bowen, J.*




       *Judge of the Superior Court of the County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


*Lafayette Bollinger Development LLC v. Town of Moraga* A163636, A164395

47

Trial Court:        Contra Costa Superior Court

Trial Judge:        Hon. Edward G. Weil

Counsel:

Wendel Rosen LLP, Fennemore Wendel, Todd A. Williams, Allan C. Moore, and Thiele R. Dunaway for Plaintiffs and Appellants.

Burke, Williams & Sorensen, LLP, Michelle Marchetta Kenyon, Kevin D. Siegel, and Maxwell A. Blum for Defendants and Appellants.

*Lafayette Bollinger Development LLC v. Town of Moraga*  A163636, A164395